**OPA (OVERSEAS PUBLISHING ASSOCIATION) AMSTERDAM BV, Harwood Academic Publishers GMBH and Gordon and Breach Science Publishers S.A., Plaintiffs,**

v.

**AMERICAN INSTITUTE OF PHYSICS and American Physical Society, Defendants.**

**No. 93 Civ. 6656 LBS.**

United States District Court, S.D. New York.

Aug. 26, 1997.

Orans, Elsen & Lupert, LLP by Leslie A. Lupert, Robert L. Plotz, Peter E. Seidman, New York City, for Plaintiff.

Covington & Burling by Richard A. Meserve, Jeffrey G. Huvelle, Susan L. Burke, Washington, DC, for Defendant.

## OPINION

SAND, District Judge.

Plaintiffs, affiliated commercial publishers of scientific journals, brought this action against defendants, not-for-profit physics societies. Plaintiffs seek to enjoin defendants from claiming in promotional materials that studies show defendants' physics publications, as measured by cost per printed character or cost per citation received within a particular timeframe, to be more "cost-effective" or "better bargains" than those published by plaintiffs. Plaintiffs claim primarily that the studies relied upon by defendants

fail to measure cost-effectiveness, making the promotions literally false representations of fact, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Some nine years after the original publication of the challenged material, and after parallel proceedings in three different foreign jurisdictions, two prior published opinions by this court, and a seven-day bench trial, the Court makes the following findings of fact and reaches the following conclusions of law.

## I. FINDINGS OF FACT

Plaintiffs OPA (Overseas Publishing Association) Amsterdam BV, Harwood Academic Publishers GMBH, and Gordon and Breach Science Publishers S.A. (collectively, "Gordon and Breach" or "G & B"), commonly known as the Gordon and Breach Publishing Group, are commercial publishers of over 300 journals in the fields of the physical and social sciences, arts and business. Among plaintiffs' publications are forty-six physics journals.

Defendant the American Institute of Physics ("AIP") is an umbrella organization of not-for-profit physics societies, including defendant the American Physical Society ("APS"). Both defendants publish physics journals; APS's 1996 revenues from publishing were $24 million, while AIP's 1995 publishing revenues were $38 million. Among defendants' publications are the *Bulletin of the American Physical Society* and AIP's *Physics Today*, a monthly magazine distributed to all members of AIP or its member societies.

### A. The Barschall Articles

Beginning in the 1980's, academic journal subscription prices began to increase at a rapid pace. (Trial Tr. 751, 995; Pl.Ex. 77) As a result, libraries—the primary subscribers to academic journals—were forced to cut back on their subscriptions, with a twofold effect: competition within the scientific journal industry, in which the top 500 journals are a $2.3 billion-per-year business (Trial Tr. 756), became more aggressive, and a cycle of price increases ensued as publishers were compelled to recover publication costs from fewer subscribers, which in turn led to high-er prices that caused more subscriptions to be dropped.

The conflict between the parties began in December 1986, when Henry H. Barschall, a physicist at the University of Wisconsin and a member of both an AIP publishing committee and the AIP Governing Board, published an article entitled "The Cost of Physics Journals" (the "1986 Article") in *Physics Today*. (Pl.Ex. 1) Beginning with the premise that "[s]cience libraries all over the United States face serious financial problems associated with the increased costs of journals," (*id.*), the 1986 Article reported a study in which Barschall used an averaging method to determine the number of characters per page of a journal, which was then multiplied by the number of pages published by the journal in that year. The resulting figure was divided into the journal's annual subscription price and multiplied by 1,000 to arrive at a cost-per-thousand-characters ("cost/kilocharacter") figure. Barschall then picked "at random one or two physics journals published by each of the major physics publishers," and presented them in tabular form sorted by cost/kilocharacter. (*Id.*)

Defendants' publications fared significantly better in the study than those of plaintiffs. The four journals published by defendants and listed in the table were the four highest-scoring journals, with costs ranging from 0.7 to 1.6 cents per thousand characters, while *Particle Accelerators,* the sole G & B physics journal listed in the table, was ranked last with a cost of 31 cents per thousand characters. While the article listed various factors which might account for the differences among some of the journals, it concluded by suggesting that libraries consider the low cost/kilocharacter of AIP and APS journals when making purchase decisions:

> Libraries benefit greatly from the low cost per printed word of journals published by AIP and its member societies. These journals also have larger circulations and wider readerships than commercial journals .... As chairman of our physics department's library advisory committee, I have the unpleasant task of advising our librarian on which journal subscriptions to cancel. Obviously the most important con-

siderations are how many people use the journal and whether the journal is available elsewhere on the campus. But I also look at cost, and my opinion is influenced not only by the price of the journal but also by the price per printed word.

(*Id.*)

Following publication, AIP and APS distributed the study promotionally. Defendants mailed reprints of the article to librarians, timed to be received just before renewal bills for subscriptions to defendants' journals. APS's cover letter accompanying the reprint stated that, "[u]sing the proper quantitative measure—the cost per published character (rather than the cost per annual subscription)—Barschall demonstrates most convincingly that the journals of The American Physical Society (and the American Institute of Physics) are a great bargain compared to other physics journals." (Pl.Ex. 33) AIP's cover letter stated that Barschall's study was "based on an accurate quantitative measure: the cost per published character, rather than the cost per subscription. Barschall demonstrates that the journals of the American Physical Society and of the American Institute of Physics are a great bargain compared to other physics journals." (Pl.Ex. 34) Meanwhile, when it learned about the survey, Gordon and Breach wrote to Barschall and APS—although *Physics Today* is an AIP publication—complaining that there were various errors in the survey and requesting that G & B be eliminated from any future such surveys (Pl.Ex. 21). AIP disputes receiving the misaddressed letter (Havens Dep. 46–47), but the Court need not resolve the issue as nothing material turns upon it.

In 1988 Barschall undertook a more comprehensive survey (the "Barschall Study" or "Barschall's study") of over 200 physics journals, including 11 of the 24 physics journals then published by G & B. This survey measured journals not only by cost/kilocharacter, but also by "impact factor." The latter measure was taken from the 1986 Science Citation Index published by the Institute for Scientific Information ("ISI"), which defined a journal's impact as the average number of citations in 1986 to articles published in that journal in 1984 and 1985. For those journals for which an impact factor was available (ISI calculates an impact factor only for selected journals), Barschall also combined these two measures into a "cost/impact" ratio, which he characterized as "perhaps the most significant measure of the cost effectiveness of the journal." (Pl. Exs. 2 and 3). A full discussion of the study's methodology and results was published in the *Bulletin of the American Physical Society*, while an abbreviated version of the study, entitled "The Cost–Effectiveness of Physics Journals," appeared in *Physics Today*.

G & B's journals fared poorly in this study, as well. The *Bulletin* article listed all the journals included in the study in tabular form, sorted by cost/kilocharacter and cost/impact. AIP and APS journals scored well for the most part, with costs/kilocharacter ranging from 0.66 to 3.4 cents and costs/impact ranging from .063 to 2.8 cents. (Pl.Ex. 2) G & B's journals were clustered toward the bottom, with costs/kilocharacter between 16.0 and 31.0 cents and costs/impact ranging from 17.1 to 45.0 cents. (*Id.*) In terms of ranking, the 11 G & B journals were among the fourteen most expensive journals on a cost/kilocharacter basis, and the 4 G & B journals for which an impact factor was available were among the ten most expensive journals on a cost/impact basis. (*Id.*)

The *Physics Today* article sorted the journals into eight different categories, within each of which journals were ranked by cost/impact ratio. (Pl.Ex. 3) An AIP or APS journal ranked first in each category, and G & B was ranked last in each of the two categories in which it appeared. (*Id.*) The article also included a table which ranked publishers by average cost/kilocharacter of their journals ("Table 2").[1] (*Id.*) APS was ranked second and AIP fifth,[2] while G & B was the lowest-ranked of all publishers. Indeed, G & B's average cost/kilocharacter was nearly twice as high as that of the second-lowest-ranked publisher. Noting that the cost/impact ratio of the journals differed by a

---

1. The table also provided average cost/impact for each publisher.

2. The first-, fourth-, and sixth-ranked publishers were also AIP member societies.

factor of as much as 850, Barschall again concluded by urging that journals which had scored well in his study—such as those published by defendants—were beneficial to libraries:

> There is no simple solution [to the problem of increasing physics journal subscription prices], but authors can help physics libraries by publishing their papers in journals that have a low cost per character. In general, articles in such journals also have a greater 'impact,' so that authors too will benefit by publishing in them.

(*Id.*)

Defendants made a number of promotional uses of the new study. Before publication of the articles, AIP sent a letter to its members, stating that Barchall's just-completed study "shows that the APS publications are the greatest bargains around. Measured by the ratio of the number of citations to the cost of the journal, the APS publications score among the highest of all, with some of our competitors orders of magnitude lower." (Pl. Ex. 53) Defendants also distributed prepublication copies of the *Bulletin* article and *Physics Today*'s Table 2 to librarians. (Pl. Ex. 42) Following publication, defendants planned to distribute the *Bulletin* article to librarians, timed to coincide with the arrival of subscription renewal notices, with a cover letter which reproduced *Physics Today*'s table ranking publishers and stated that Barschall's study "places [AIP's] publications in the highest ranks of quality and value." (Pl. Exs. 65B, 71 at APS 003123) This mailing was cancelled after plaintiffs threatened to sue defendants. (Pl.Ex. 77 at APS 005165; Trial. Tr. 364–65) Defendants also made presentations to librarians, at which reproductions of Table 2 were shown. (Pl.Exs.122, 130).

## B. The Dispute Between the Parties

G & B wrote to AIP after publication of the 1988 articles, identifying various alleged errors in the *Physics Today* article and demanding a prompt retraction. (Pl.Ex. 61) AIP refused to issue a retraction, but published a statement in *Physics Today* reporting the dispute between the parties, inform-

ing readers that G & B had declined an offer to publish a letter in *Physics Today* stating its views, and inviting readers to contact G & B directly should they wish to learn more. (Pl.Ex. 74) In the same issue the magazine published a letter from Barschall which responded to some of G & B's complaints. (*Id.*)

Plaintiffs subsequently brought actions against defendants and Barschall in France, Germany, and Switzerland, and on September 23, 1993, filed the instant action. Plaintiffs alleged primarily that the Barschall studies constitute a literally false advertisement in violation of section 43(a) of the Lanham Act, 15 U.S.C. §§ 1125(a). Defendants disputed plaintiffs' claim and contended that, in any event, the doctrine of unclean hands prevented G & B from obtaining relief, because G & B had inequitably engaged in unjustified litigation and harassment as part of a program to suppress all criticism of its journals. In two prior published opinions which more fully explored the factual background of the case, this Court ruled, *inter alia,* that (i) claims regarding the 1986 Article were time-barred, *Gordon and Breach Science Publishers S.A. v. American Institute of Physics,* 859 F.Supp. 1521 (S.D.N.Y. 1994) ("*G & B I*"); (ii) the original publication of the Barschall articles was protected speech under the First Amendment, but that their promotional distribution to the core consumers of physics journals fell within the scope of the Lanham Act, *id.;* (iii) it would not give collateral estoppel effect to judgments favorable to the defendants rendered in the Swiss and German actions, *Gordon and Breach Science Publishers S.A. v. American Institute of Physics,* 905 F.Supp. 169 (S.D.N.Y.1995)[3]; and (iv) advertisements which touted defendants' journals with language such as "the most cost-effective prices," but which made no reference to the Barschall study, were mere puffery and thus fell outside the ambit of the Lanham Act. *Id.*

## C. Evidence at Trial

The Court conducted a bench trial from June 9 to June 17, 1997. By the time of trial

---

**3.** Who prevailed in the foreign actions is not material to this opinion.

the 1988 Barschall articles were too stale to be used for further promotion, but defendants stipulated that they "intend to use surveys employing the Barschall methodology [as reflected in the Barschall articles] for commercial advertising or promotion as those terms are used in the Lanham Act." (Def. Stipulation dated June 10, 1997). Plaintiffs therefore eschewed any claim for money damages and limited their requested relief to an injunction against future promotional use of studies employing the methodology used in Barschall's study.[4]

Plaintiffs' evidence at trial was directed toward demonstrating that librarians would be poorly-served if they relied exclusively on Barschall's study to determine journal cost-effectiveness. Plaintiffs relied primarily on two expert witnesses, Dr. Bruce Kingma, an economist at the State University of New York at Albany whose principal area of research is the economics of information and, in particular, library management (Trial Tr. 106–7), and Donald King, who has worked in information science for some 30 years. (*Id.* 416) While Kingma somewhat criticized the reliability of Barschall's methodology, the thrust of Kingma's testimony was that Barschall's study was an ineffective measure of cost-effectiveness, which embodies a claim both as to price paid and benefit received. Professor Kingma opined that Barschall's normalization of journals on a cost per character basis was inappropriate because a library's concern is not how much ink and paper it can get for its purchasing dollar, but how much use its patrons will make of the purchased material. (*Id.* 114). The impact factor does not compensate as a measure of use, stated Kingma, because different types of journals and different subdisciplines have different levels of citation, which he testified says nothing about their relative value or effectiveness. (*Id.* 117–24).

King concurred with Kingma that the most appropriate measure of cost-effectiveness was cost per use. (*Id.* 434) Like Kingma, he also felt that impact is a poor surrogate for use because it does not measure local use. (*Id.* 448) King also testified that cost per character is a poor basis for comparing journals because it fails to account for the justifications for such differentials (*id.* 433), primary among which was that niche journals, which are usually published by commercial publishers, serve a discipline having a limited audience so that the fixed costs of printing a journal must be borne by fewer subscribers resulting in higher costs per character. (*Id.* 437–41). As a result, he felt that a librarian relying only on a Barschall-type study would make "some horrendous mistakes." (*Id.* 440; 454, 491).

Defendants presented two experts to rebut plaintiffs' claims about the Barschall study's usefulness. Professor Norman Ramsey, professor emeritus of physics at Harvard University (*id.* 501), Nobel laureate in physics (*id.* 504), and former chairman of the Governing Board of AIP and president of APS (*id.* 520), testified that libraries should not rely exclusively on the Barschall methodology in developing their physics journal collections, but that it was important for librarians to have the information contained in the Barschall study to take into account. (*Id.* 531–32). Michael A. Keller, University Librarian and Director of Academic Information Resources at Stanford University (*id.* 732), disputed Kingma's testimony that only local use and price should be considered in collection de-

---

4. Plaintiffs proposed injunction reads:

Defendants AIP and APS are prohibited from broadcasting, publishing or disseminating, in any form or medium, any advertisement, commercial, or promotional matter that claims directly or indirectly, or by clear implication, based upon the methodology (*normalized cost (e.g., cost per character, cost per word, cost per page) divided by any citation-based statistic, including but not limited to impact factor as defined by the Science Citation Index published by ISI*) employed by Henry Barschall in the December 1986 and/or July 1988 issues of *Physics Today* and/or the July 1988 issue of the *Bulletin of the American Physical Society* that (1) any journal published by plaintiffs is less cost-effective, inferior, or of less value than a journal published by others; or (2) that the plaintiff companies generally publish less cost-effective, inferior, or less valuable journals than others; or (3) that any journal published by either defendant is more cost-effective, superior, or more valuable than a journal published by others; or (4) that either or both defendant companies generally publish more cost-effective, superior, or more valuable journals than others.

(Pl. Rep. Mem. at 29–30) (emphasis in original).

velopment; he testified that his library also considers the global practice of the discipline, other means for acquiring the information needed for a discipline, and future use of material. (*Id.* 736–37). He also testified that the identity of a journal's publisher may impact upon an acquisition decision (*id.* 740–41), and that normalization of journal prices on some quantitative basis is often performed. (*Id.* 747).

Another expert for defendants was Paul Ribbe, a mineralogist and professor emeritus at Virginia Tech University whose research focused on crystallography and the physics and chemistry of minerals. (*Id.* at 983–84). Among Ribbe's 100–plus published papers are four on bibliometrics (Def. Ex. U; Trial Tr. 989), and he has served as an academic journal editor and on his department's library committee. (Trial Tr. 985–86) Ribbe undertook a comprehensive quantitative analysis of physics journals, normalizing them on a number of unit cost and citation frequency bases. Ribbe's results, which revealed no marked differences among normalization bases, were proferred to demonstrate that Barschall's methodology yields reliable results.

In support of their unclean hands defense, defendants introduced evidence that G & B has engaged in an aggressive corporate practice of challenging any adverse commentary upon its journals, primarily through threatened (and actual) litigation. This evidence persuasively demonstrated that the present suit is but one battle in a "global campaign by G & B to suppress all adverse comment upon its journals." (Def. Post–Trial Mem. at 17–18) Although ultimately it is unnecessary to reach defendants' affirmative defense, the Court sets forth some of the facts on which the defense is based because they provide a useful context for understanding the nature of this controversy and plaintiffs' reaction to criticism of their costs. *See infra* Section II.B.1.b.

### 1. The American Mathematical Society

The American Mathematical Society (the "AMS") is a scientific society dedicated to mathematics. It periodically publishes a survey of mathematics journal subscription prices, normalized on a price-per-thousand-characters basis. In 1985, G & B objected through its New York counsel to the survey's methodology and made a thinly-veiled threat to file suit should G & B journals be included in future price surveys. The AMS therefore agreed to exclude G & B's journals from its 1986 survey. (Pl.Exs.502–06).

In 1986, the European Mathematical Council ("EMC") undertook a companion survey of mathematical periodicals' subscription prices, limited to those published in Europe. The survey normalized journals on a price-per-thousand-characters basis and was published in the AMS *Notices* in 1986. After a G & B journal fared poorly in the survey, EMC sent G & B a letter which acknowledged that there could be "special features in [G & B's] case which justifies additional expenditure" but sought G & B's "cooperation in keeping costs down." In response, G & B accused the EMC of trade libel and advised that all future correspondence would be through G & B's attorneys. (Pl.Exs.507–08).

G & B's correspondence with the societies left some ambiguity as to the extent of the parties' agreement: while G & B requested that it be excluded from all future surveys (Pl.Ex. 504), the AMS agreed that G & B would be excluded from the next survey, and the EMC stated that it would "take a similar line" and that future surveys would indicate "which publishers have been omitted from the survey at their own request." (Pl.Ex. 509). Neither society explicitly affirmed that G & B would be omitted from *all* future surveys.

As a result, the AMS, with some trepidation and after consultation with counsel, decided to include G & B in its 1989 survey. (Trial Tr. 660–61; Pl. Exs. 510–12). The evidence reflects recognition by the AMS that inclusion of G & B might be risky, but the Court cannot say whether the perceived "risk" was that a prior agreement might be broken, or simply that G & B might repeat its prior conduct. The AMS solicited from G & B, and received in response, verification of price information for G & B's mathematics journals. (Pl.Ex. 513) Following publication of the 1989 survey, however, G & B, again through American counsel, demanded a re-

traction, asserting that the survey contained erroneous price information for Gordon and Breach journals, and was a breach of the parties' prior agreement. (Pl.Ex. 516).

While the parties traded correspondence relating to resolution of this dispute, G & B ventured to Germany, a forum in which neither organization has its principal place of business, and obtained an ex parte injunction against the AMS barring distribution of surveys in which G & B journals were included. (Pl.Ex. 524) G & B obtained this injunction ex parte even though publication had already taken place and there was no imminent threat of repetition. However, testimony at trial indicated that it "would not be very unusual" in the German procedural system to obtain an injunction to be held in reserve while settlement negotiations are taking place. (Trial Tr. 863).

When William Jaco, Executive Director of the AMS, published an editorial in the *Notices* describing the litigation (Pl.Ex. 528), G & B turned to yet another forum. Plaintiffs' British counsel wrote to Jaco, describing his editorial as "highly defamatory" and demanding "a complete and unreserved apology and retraction in terms and of a prominence to be approved by us" and "the making in Open Court of a statement in terms to be agreed with us." (Pl.Ex. 530) Ultimately, AMS issued no retraction, and no litigation was brought.

### 2. Early Child Development and Care

In spring 1988, Joel Rutstein, a librarian at Colorado State University, wrote a letter to the editor of the G & B publication *Early Child Development and Care* cancelling the University's subscription to the journal and stating that he would use the journal as a "blatant example of price gouging." (Pl.Ex. 571) G & B's chairman responded with a letter stating "we will sue you for slander defamation and hold you and your University responsible .... [u]nless we receive a complete retraction." (Pl.Ex. 572) At about the same time, in a June 1988 university publication, Joseph A. Boissé, University Librarian at the University of California at Santa Barbara, characterized G & B's *Early Child Development and Care* as a "culprit" in

"price gouging" by publishers. (Pl.Ex. 574) G & B's chairman again responded personally, seeking a retraction and threatening a "trade libel action" should one not issue. (Pl.Ex. 577) The essence of G & B's position was that Boissé, like Rutstein, had failed to recognize that the price of the journal had not materially increased on a per page basis. (*Id.*) But when Boissé responded by seeking historical subscription rate and publishing information regarding the journal in order to determine whether he had made an error, G & B's attorneys replied that the request was "a wholly inappropriate response to our demand for a retraction, and no such information will be provided." (Pl.Ex. 581) G & B's attorneys repeated the accusation of libel and again threatened legal action should a retraction not be printed.

Meanwhile, in an editorial in *College & Research Libraries,* James C. Thompson, University Librarian at the University of California at Riverside, referred to G & B's "irate letters to librarians who have canceled [its] titles, including at least one threat to sue for complaining to an editor that issues of a certain journal are now being labeled as volumes." (Pl.Ex. 580) The Thompson editorial seems clearly to refer to the Rutstein letter and G & B's response thereto. Nonetheless, in a series of letters through the winter of 1989, G & B's attorneys accused Boissé and the University of California General Counsel's office of disclosing and misrepresenting to Thompson confidential correspondence (based on the stated assumption that Thompson's reference was to the Boissé incident). (Pl.Exs.583A–85A) G & B demanded that Thompson print a retraction in *College & Research Libraries,* and threatened to sue the University of California. (*Id.*)

Boissé ultimately printed a retraction which recited that "Gordon and Breach indicates" a number of factors related to their subscription costs. (Pl.Ex. 586) The record does not reflect that Thompson ever issued a retraction, or that any lawsuit was filed.

### 3. Dr. Octave Levenspiel

In a letter in the Summer 1988 issue of *Chemical Engineering Education* ("CEE"), Dr. Octave Levenspiel of Oregon State Uni-

versity compared the relative costs per volume and costs per 1,000 words of the journal *Chemical Engineering Science* ("*CES*") and Gordon and Breach's *Chemical Engineering Communications* ("*CEC*"). (Pl.Ex. 600) G & B responded with a letter to the editor of *CEE* alleging discrepancies in Levenspiel's comparison and labeling Levenspiel's letter a "libelous attack," (Pl.Ex. 602); the missive was also sent directly to Levenspiel under cover of a letter from G & B's attorneys, which labeled Levenspiel's letter "potentially libelous" and directed that "you should submit a retraction ... [since] a failure to retract false and defamatory charges increases the seriousness of the offense and increases your legal exposure." (Pl.Ex. 602A) When the editor of *CEE* indicated that he would publish G & B's letter along with a response by Dr. Levenspiel, G & B's counsel threatened to sue Levenspiel and *CEE*'s publisher, the American Society for Engineering Education. (Pl.Ex. 603) G & B ultimately dropped the matter.

### 4. Simone Jerome

Simone Jerome, a librarian at the University of Liege in Belgium, authored an email message which criticized G & B's prices as "FOUR to TEN times higher than its competitors" and characterized its journals as "a shelter for authors who have not found their way to more selective journals." Ms. Jerome included a disclaimer stating "[t]his is my own opinion. It does not engage my Institution and [sic] anybody else." (Pl.Ex. 640) The day after the message was distributed through an Internet LISTSERV subscription list, G & B's British counsel faxed a letter to the Rector of the University of Liege, referring to Jerome's message as "highly defamatory," demanding a retraction, and asserting that G & B would consider the University liable for Jerome's actions notwithstanding her disclaimer of institutional representation. (Pl.Ex. 641) G & B's British lawyers also forwarded a letter from G & B's American

attorneys in the instant case, threatening that Ms. Jerome and the University "may well become enmeshed in various litigations in Europe and the United States." (Pl.Ex. 643) G & B ultimately decided not to carry through on its threat. (Pl.Ex. 644).

## II. CONCLUSIONS OF LAW

Plaintiffs' action is brought pursuant to section 43(a) of the Lanham Act[5], which provides that

> Any person who, on or in connection with any goods or services ... uses in commerce any ... false or misleading description of fact, or false or misleading representation of fact, which—
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods ...
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B) (1992).[6]

▮ To succeed in a claim brought pursuant to § 43(a), plaintiffs must demonstrate that the advertisement " 'is either literally false or that the advertisement, though literally true, is likely to mislead and confuse consumers.' " *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 61 (2d Cir.1992) (quoting *McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir.1991)). If the advertisement is demonstrated to be literally false, "the court may grant relief without reference to the advertisement's impact on the buying public." *Coca–Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 317 (2d Cir.1982); *see Castrol*, 977 F.2d at 61; *McNeil–P.C.C.*, 938 F.2d at 1549.

▮ Where, as here, a plaintiff seeks to prove only literal falsity, its burden depends on the nature of the challenged advertisement.

---

**5.** Plaintiffs' complaint also alleges a violation of sections 349 and 350 of the New York General Business Law. Plaintiffs have not pursued this claim and accordingly the Court does not address it. *Cf. Avis Rent A Car System, Inc. v. Hertz Corp.*, 782 F.2d 381, 381 n. 1 (2d Cir.1986).

**6.** Although this action is governed by the statute as it read in 1988 when the relevant acts occurred, the Court refers to the current language of the statute since it does not differ in any material respect for purposes of this action. *See G & B I*, 859 F.Supp. at 1531 n. 5.

Where the defendant's advertisement claims that its product is superior, plaintiff must affirmatively prove defendant's product equal or inferior. Where, as in the current case, defendant[s'] ad explicitly or implicitly represents that tests or studies prove [their] product[s] superior, plaintiff[s] satisf[y their] burden by showing that the tests did not establish the proposition for which they were cited.

*Castrol,* 977 F.2d at 63. A plaintiff meets this burden in one of two ways: either by "demonstrating that the tests were not sufficiently reliable to permit a conclusion that the product is superior," or by showing that "the tests, even if reliable, do not establish the proposition asserted by the defendant." *Id.*

Plaintiffs in essence attempt to prove both that Barschall's tests are not reliable, i.e., that the empirical results reached are unreliable in light of the methodology by which they were derived [7], and that even if the tests are reliable, the proposition which they establish is not the same as that for which they were cited. The Court deals with each claim in turn.

### A. Reliability of Barschall's Methodology

▉ In determining the reliability of a testing method, the Second Circuit has instructed district courts to

consider all relevant circumstances, including the state of the testing art, the existence and feasibility of superior procedures, the objectivity and skill of the persons conducting the tests, the accuracy of their reports, and the results of other pertinent tests.

*Procter & Gamble Co. v. Chesebrough–Pond's Inc.,* 747 F.2d 114, 119 (2d Cir.1984). Barschall's methodology calculates the cost/kilocharacter and cost/impact ratio for the journals included in the sample. The Barschall articles used this methodology to rank journals by these measures, and also used it to rank publishers according to the

average scores of their respective journals. Considering each of the above factors in turn, the Court concludes that Barschall's methodology was sufficiently sound and reliably established his results.

### 1. State of the Testing Art

This factor militates in favor of defendants. Defendants somewhat overstate the matter when they contend that Barschall's study was part of "a continuum" of similar research studies (Def. Post–Trial Mem. at 39); there is no evidence of a single such study between 1933 and 1985, and Barschall's study was unique at the time in including impact factor as a criterion. But evaluating journals by their cost per character, or some other normalization on the basis of cost and quantity, was not unprecedented. The AMS had already performed such studies (Pl.Ex. 515), and similar studies had been made of chemistry, optics, and crystallography journals. (Trial Tr. 1047–61) Like studies have been made since, including normalizations based of cost on a per citation basis. (*Id.*) Indeed, Keller testified that normalization of cost has become important over the last 15 years because of the rate of journal price increases. (Trial Tr. 751) Finally, rather than pointing to another, preferred methodology, plaintiffs simply contend that there is *no* testing art for price comparisons among journals. Even were Barschall's methodology not historically sanctioned, plaintiffs have failed to demonstrate that the methodology in any way deviates from the state of the art.

### 2. Existence and Feasibility of Superior Procedures

Plaintiffs presented no evidence of superior procedures for calculating costs per kilocharacter and costs per impact, nor do they suggest that Barschall somehow did not tally his numbers correctly. Indeed, plaintiffs' expert King explicitly agreed that Barschall's method of data collection and analysis was sound. (Trial Tr. 478, 481) Instead, Plaintiffs presented evidence that there are superior

---

7. Although plaintiffs at one point concede that "there is no dispute" that "whatever variant of cost per citation or impact is used, the societies do very well and the commercial publishers do not" (Pl. Post–Trial Mem. at 11), some of their arguments nonetheless are directed to shortcomings in the methodology (*e.g., id.* at 42–44, discussing unreliability of ISI impact factor as compared to overall citation count). The Court accordingly takes up the analysis.

procedures for determining a journal's cost-effectiveness. This evidence, however, goes to the issue of whether the study demonstrates the proposition for which it is cited, not the reliability of the empirical data produced. Similarly, plaintiffs' evidence regarding whether purchasing decisions should be based on comparisons between dissimilar journals, and whether defendants encouraged customers to base their purchase decisions on the comparisons made in the Barschall articles, does not speak to whether the data Barschall presented was factually true.

### 3. Objectivity and Skill of the Tester

Barschall held a doctorate in physics from Princeton University, was a member of the National Academy of Sciences (where he had been chairman of the physics section) and a Fellow of the American Academy of Arts and Sciences, and had some 80 published papers to his name. (Def.Ex. V) His aptitude at collecting and analyzing quantitative data cannot seriously be contested, and the Court thus finds that Barschall was sufficiently skilled to carry out the analyses that he performed. Barschall's lack of experience in information or library science goes to the issue of his expertise in determining the most suitable basis for comparing journals, but in no way calls into doubt his skill in performing his analysis.

As for objectivity, plaintiffs have demonstrated both that Barschall was a member of various of defendants' committees, and that he consulted with the publishing arms of defendants in preparing his study. (Pl. Exs.35, 36, 47, 57–59) The Court gives little weight to the possibility of Barschall's partiality, however, in light of defendants' verification of Barschall's results, as discussed below. In any event, the Court gives less weight to this factor in its analysis because plaintiffs' challenge focuses on Barschall's methodology rather than his execution of the study.

### 4. Accuracy of Barschall's Reports/Results of Other Pertinent Tests

Plaintiffs' expert Dr. Kingma purported to identify four potential errors in Barschall's methodology: (1) Barschall used only those journals available at his university's library and therefore used a non-random sample; (2) Barschall made errors in counting and in some instances in extrapolating the number of pages in a journal (upon which he relied in calculating the total number of characters); (3) Barschall made further errors in computing the number of characters by multiplying the number of characters in a line by the number of lines per page, even if some pages contained tables (and therefore fewer characters); and (4) Barschall used inconsistent sources for obtaining journal prices. (Trial Tr. 136–38; see Pl. Post–Trial Mem. at 42–44). King also testified that the narrow two-year period for which impact factor measures citations introduces the potential for bias. (Trial Tr. 449).

Defendants, however, presented an expert report from Paul Ribbe which conclusively established the reliability of Barschall's methodology. Ribbe corrected for several alleged errors in Barschall's methodology: he personally counted the pages for the relevant year in the 70% of the journals to which he had access (including all of plaintiffs' and defendants' journals included in Barschall's study) (id. 1002, 1005); he obtained those journals' prices from a uniform source, always using the least expensive price if more than one was listed (id. 1003–4); he excluded from his sample those journals for which ISI did not compile an impact factor (id. 996–97); and he verified the impact factors for each journal for which impact factor was compiled. (Id. 999) Ribbe then recalculated journal scores not just by cost/kilocharacter and cost/impact, but by annual cost divided by average annual number of citations, and annual cost divided by total 1986 citations to all of a journal's prior articles. (Def. Exs. A, B, E, N; Trial Tr. 1006–7, 1022) On a cost/kilocharacter basis, G & B's journals ranked 143, 145, 146, and 148 out of 148. (Def.Ex. D) By the measure most favorable to plaintiffs, cost divided by total citations, defendants' worst-performing journal still ranked 66th, while plaintiffs' highest-ranking journal was 126th. (Def.Ex. E).

Ribbe also recalculated by dollars per page (and cost per page divided by total citations) rather than cents per kilocharacter, to accommodate the concern that pages with

graphical material mistakenly will be equated with text-only pages for character counting. (Trial Tr. 1005–6) Plaintiffs again scored poorly, with their *least* expensive journal on a per page basis nearly three times more expensive than defendants' *most* expensive journal on a per page basis. (Def.Ex. C) In sum, regardless of the measure used, G & B's journals consistently scored at the bottom. Ribbe also demonstrated that plaintiffs' poor showing by such measures extended to journals in other disciplines. (Def.Exs.K, O) Finally, Ribbe averaged the data for each publisher, as was done in Table 2 in the 1988 *Physics Today* article. In every category, G & B received the worst score.

No evidence was received contesting Ribbe's analysis. Rather than challenging Ribbe's report, plaintiffs' expert King admitted that he had no factual basis for believing Barschall's results would have been different had he used total citations rather than impact (Trial Tr. 472), and Kingma forthrightly acknowledged that correcting for the alleged errors he identified would *not* affect Barschall's results. (*Id.* 138) Plaintiffs' own expert thus concurred with Ribbe's assessment that Barschall's results were reliable. (*See supra* note 7).

Weighing these factors, the Court easily concludes that Barschall's methodology reliably establishes the costs/kilocharacter and costs/impact of the journals in his survey, as well as the rankings of journals and publishers based on those measures. Plaintiff made no serious effort to attack the data relied upon by Barschall or his method of calculation, other than to assert that his position as an APS officer rendered him fatally biased. In the absence of affirmative evidence suggesting that Barschall's conclusions were erroneous, and particularly in light of Ribbe's verification of Barschall's results, G & B has failed to carry its burden of demonstrating that defendants' methodology was not sufficiently reliable to establish the results reached.

B. *Whether Barschall's Study Establishes the Proposition for Which it was Cited*

█ Most of G & B's evidence at trial was directed towards establishing that Barschall's

methodology does not establish journal cost-effectiveness and fails to account for various differences among journals, making his analysis an inappropriate basis upon which physics journal subscribers should rely when making purchase decisions. Plaintiffs thus argue that defendants' promotional claim that Barschall's study proves their journals to be cost-effective is literally false, and that defendants' promotional use of Barschall's study carries a false implied message that Barschall's study, to the exclusion of all other factors, should be used as the basis for journal purchase decisions.

1. *The Literal Message of Defendants' Promotions*

In order to determine whether defendants' promotions were literally false, the Court first must determine whether plaintiffs accurately characterize the literal message conveyed by defendants' promotions. In making this determination, the Court considers the context of the challenged portion of the promotional material, scrutinizing it "within a meaningful and reasonable context, including not only the entire sentence of each portion of challenged text but also the entire text and overall message of the [material .]" *JR Tobacco of America, Inc. v. Davidoff of Geneva*, 957 F.Supp. 426, 432 (S.D.N.Y.1997); *see Avis*, 782 F.2d at 385; *Vidal Sassoon, Inc. v. Bristol–Myers Co.*, 661 F.2d 272, 276 (2d Cir.1981).

a. *Cost-Effectiveness*

Plaintiffs' contend that defendants' promotions claim that Barschall's method establishes overall cost-effectiveness. The Court disagrees. The 1988 Articles themselves convey a message only as to cost-effectiveness as measured by cost/kilocharacter or cost/impact. The *Physics Today* article states in its subtitle that the survey shows journal "cost-effectiveness, *as measured by the ratio of the printed character to the frequency with which the articles are cited.*" (Pl.Ex. 3 at 56) (emphasis added). The article thus immediately qualified and defined its

use of the term "cost-effective," stating the factors which entered its assessment of cost-effectiveness without implying that the study was the only conceivable measure of cost-effectiveness. Similarly, in the opening paragraph of the article, Barschall states that subscription decisions

> are usually based on the research interests of the users of the library, but the decision-making process can be improved if *a* quantitative measure of the cost-effectiveness of journals is available. *An* oft-used measure is the cost per printed character; *another* is the frequency with which articles in the journal are cited, often referred to as the "impact." The ratio of these two measures is *perhaps* the best indicator of a journal's cost-effectiveness.

(*Id.*) (emphasis added) As the underscored language indicates, Barschall explicitly acknowledged that subscribers must consider their particular usage needs, stated that there are multiple measures of cost-effectiveness, and only opined that his ratio *might* be the best.

Defendants were also careful to qualify their claim in the cover letters which accompanied their promotional redistributions of the study. APS's May 1988 letter to society members reported that the Barschall study "shows that the APS publications are the greatest bargains around. Measured by the ratio of the number of citations to the cost of the journal, the APS publications score among the highest of all, with some of our competitors orders of magnitude lower." (Pl. Ex. 53) By juxtaposing the qualitative claim "greatest bargain" immediately next to a statement of the measures used in the study, the letter conveys only that APS publications are a great "bargain" as measured by the stated yardsticks, not that those yardsticks are the only conceivable measures one might use. A September 1988 APS letter to non-member subscribers similarly qualified its claim, stating that APS journals "remain extremely inexpensive when compared to other physics publications. When their utility is also included, *are (sic) measured by the Citation Index,* they are even less expensive." (Pl Ex. 65A) (emphasis added).

As for defendants' presentations to librarians, the evidence reflects that the librarians were shown the data from Barschall's study, allowing them to see the factors which entered into defendants' claim of cost-effectiveness. (*E.g.,* Pl.Ex. 122) Moreover, plaintiffs adduce no evidence that defendants failed to qualify their claim precisely as they did in all of their printed material, dating back to their use of the 1986 Article. (*See* Pl. Exs. 33 and 34).

Plaintiffs make much of the cancelled September 1988 AIP letter to subscribers, which stated, without qualification, that Barschall's study placed AIP's publications "in the highest ranks of quality and value." (Pl.Ex. 65B; Pl. Post–Trial Mem. at 12–13) A quantitative test of certain cost factors does not necessarily prove the existence of subjective features such as "value" or "quality." Were defendants now to be asserting that Barschall's methodology proves that their product is superior to that of plaintiffs, serious concerns would be present. But the fact is that the sole material which spoke without qualification of "value" or "quality" was never disseminated, and thus, having not been put to promotional use, cannot substantiate a finding of a Lanham Act violation.

Nor would injunctive relief be necessary to ensure that defendants do not make such a claim. Defendants apparently now acknowledge that Barschall's analysis does not demonstrate abstract product superiority or quality. (Def. Post–Trial Mem. at 68) There is no need to enjoin the making of a claim which defendants have never in fact disseminated and do not threaten to disseminate in the future. For example, in *Knickerbocker Toy Co., Inc. v. Azrak–Hamway Int'l, Inc.,* 668 F.2d 699 (2d Cir.1982), the defendant's catalog allegedly used artwork illustrating the plaintiff's product in order to sell the defendant's competing product. The defendant, however, had withdrawn the catalog after only four days of distribution, had received no orders for its competing product, and contemplated no further use of plaintiff's artwork. *Id.* at 702–03. The district judge, in a conclusion affirmed by the Second Circuit, found it unnecessary to determine whether there had been a Lanham Act viola-

tion because, "since the irregularities had been eliminated and were unlikely to recur there was no basis for any injunctive relief." *Id.* at 702. The only compelling distinction between *Knickerbocker* and the instant case is that, unlike in *Knickerbocker*, defendants have made no distribution whatsoever of the potentially offending material, so that injunctive relief would be even more inappropriate in this case. *See also Burndy Corp. v. Teledyne Indus., Inc.,* 748 F.2d 767, 774 (2d Cir.1984) (injunctive relief "wholly unnecessary" given defendant's rectification of any infringement and the absence of any likelihood of repetition); *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.,* 997 F.2d 484, 489 (8th Cir.1993) (district court was not erroneous in declining to grant an injunction where defendant had voluntarily taken remedial action); *Reader's Digest Ass'n, Inc. v. Conservative Digest, Inc.,* 821 F.2d 800, 807 (D.C.Cir.1987) ("when a defendant has ceased its infringing conduct and shows no inclination to repeat the offense," no injunction need issue); *Schutt Mfg. v. Riddell, Inc.,* 673 F.2d 202, 207 (7th Cir.1982) (no abuse of discretion for district court to find that "because [defendant] clearly did not threaten to persist in or resume the allegedly infringing or unfair conduct, equitable relief would be inappropriate"); *In re Circuit Breaker Litigation,* 860 F.Supp. 1453, 1456 (C.D.Cal.1994) ("[C]ourts grant injunctions if they suspect that defendant might infringe again, even if the infringement has ceased for the moment. If, on the other hand, the defendant infringed

innocently, ceased before judgment and assured the court that it has no intention of infringing in the future ..., courts usually deny requests for permanent injunctions.") (internal citations omitted), *aff'd sub nom. Westinghouse Elec. Corp. v. General Circuit Breaker & Elec. Supply Inc.,* 106 F.3d 894 (9th Cir.1997), *petition for cert. filed,* 65 U.S.L.W. 3085 (U.S. June 25, 1997) (No. 97–2).[8]

The Court therefore finds that defendants' promotions claimed only that their journals were cost-effective as measured by cost/kilocharacter or cost/impact.

### b. Factors Purchasers Should Consider

Most of plaintiffs' evidence was designed to show that there are legitimate reasons why their journals cost more as measured by Barschall's methodology, and that subscribers would be poorly-served if they relied only on the results of Barschall's methodology in making purchasing decisions.[9] For example, plaintiffs argue that they publish more specialized journals (so-called "niche" publications) catering to smaller audiences than do defendants. Additionally, unlike defendants, plaintiffs do not offset their publication costs by asking authors to pay "page charges" for published articles. Consequently, they must recover higher fixed costs of publication from a smaller pool of subscribers, resulting in higher subscription costs. Plaintiffs also emphasize that the physics community needs commercial publishers (Trial Tr. 535, 544),

---

**8.** To support their claim that an injunction is appropriate, plaintiffs rely on *Playboy Enters., Inc. v. Chuckleberry Publishing, Inc.,* 511 F.Supp. 486 (S.D.N.Y.1981), *aff'd,* 687 F.2d 563 (2d Cir.1982), in which an injunction issued even though the defendant said it had no current intention of repeating the objectionable conduct. In *Playboy,* however, the defendant had already published a magazine with a subtitle infringing the plaintiff's trademark. *Id.* at 495. The defendant also readily admitted that but for the court's injunction it would make use of an infringing name. *Id.* at 489. *See also Blisscraft of Hollywood v. United Plastics Co.,* 294 F.2d 694 (2d Cir.1961) (injunction issued even though defendant had ceased infringing plaintiff's trademark, but infringement had actually occurred and defendant continued to contest validity of plaintiff's mark); *National Geographic Soc'y v. Conde Nast Publications Inc.,* 687 F.Supp. 106 (S.D.N.Y.1988) (injunction is-

sued where defendant's agreement to cease trademark infringement "came only in response to National Geographic Society's lawsuit," but actual infringement had already occurred). Each of these cases is readily distinguishable from the present circumstances, in which there has been no predicate violation and defendants have by no means indicated that they will undertake the conduct plaintiffs seek to enjoin.

**9.** King testified that his only concern was how Barschall's data might be used (*id.* 481, 445), and that he would be "content" with studies based on Barschall's methodology if the studies stated (i) that libraries should consider other factors, especially their particular users' needs, and (ii) that highly specialized journals with limited circulation necessarily have different cost considerations. (Trial Tr. 456–57)

but that were purchase decisions based solely on Barschall's study, niche publications would be driven out of business. As a result, articles could only be published in more generalized journals, and thus subscribers needing only articles in a specialized subdiscipline would effectively be forced to pay for unneeded articles. (*Id.* 444–45).

As the Court suggested during trial (Trial Tr. 551), however, these arguments are simply irrelevant to the claim that defendants' material is literally false—the Barschall articles contain no analysis of the reasons for the cost differentials. In an attempt to work around this considerable obstacle, plaintiffs argue that defendants' materials contain an implied message that journal purchase decisions should be based only on Barschall's study. This, they contend, is fallacious because their evidence demonstrates that decisions should be based on a more nuanced and complex analysis.

The Court finds no such implied message in defendants' use of the Barschall study. The 1988 articles, and the cover letters which accompanied defendants' promotional distribution of it, identify a feature of their journals which the study irrefutably demonstrates to be true—cost-effectiveness as measured by cost/kilocharacter or cost/impact. Nothing in the articles or cover letters suggests to the reader that they use this information to the exclusion of all other factors in making purchasing decisions.

Furthermore, to the extent that the promotion necessarily contains an implied message urging consumers to buy the promoted goods based on their advertised qualities, *every* advertisement contains such an implied pitch. Urging consumers to make a particular purchase, however, without more, is not actionable under the Lanham Act. *See* 15 U.S.C. § 1125(a) (Lanham Act reaches only false or misleading descriptions or representations of fact). For example, in *Castrol*, the plaintiff prevailed because although the defendant's test showed its motor oil to have faster lubrication times than the motor oils of its competitors, the defendant made the further unsubstantiated claim that its oil better protected against engine wear. *Castrol*, 977 F.2d at 64–65. G & B, however, apparently would have the defendants in *Castrol* held liable if the plaintiffs could show that consumers ideally should not purchase motor oil based on "pumpability" considerations alone.

Plaintiffs misapprehend the purpose and scope of the Lanham Act's limits on commercial advertising. The Act contemplates a free market into which advertisers are not to inject false or misleading information, but in which, as in any free market, it is up to the consumer to see to it that only the product that best serves the consumer's needs is bought. If G & B believes librarians will make more optimal decisions if they consider information other than that provided by defendants, its solution is to augment rather than censor the available truthful information. G & B's arguments that librarians will not adequately discharge their responsibilities if they rely solely on the output of Barschall's methodology are thus best addressed to librarians, not this Court.[10]

### 2. Whether the Test Establishes the Message

Because plaintiffs have failed to demonstrate that Barschall's methodology yielded unreliable cost/kilocharacter and cost/impact results, their claim that his study fails to support the proposition for which it was cited—that, as measured by cost/kilocharacter and cost/impact, defendants' journals are cost-effective—necessarily fails. Plaintiffs' evidence that there are reasons *why* their journals cost more in no way makes false the statement that they *do* cost more. Likewise, that librarians should consider more than cost-effectiveness as measured by cost/kilocharacter or cost/impact in making purchasing decisions does not make the cost/kilocharacter or cost/impact figures false. As defendants rightly submit, "[t]he methodology is not false simply because the results

---

10. Plaintiffs assert that because they claim that defendants' statements were literally false rather than misleading, the sophistication of the audience, i.e., librarians, is irrelevant. Pl. Post–Trial Mem. at 16. Defendants dispute this contention.

Def. Reply Mem. at 8, n. 7: Because the Court finds that there has been no showing of literal falsity even with regard to an unsophisticated audience, it need not address this issue.

must be used with care." (Def. Post–Trial Mem. at 49) The Court therefore finds for defendants on plaintiffs' cause of action, and does not reach defendants' affirmative defense.

## CONCLUSION

Barschall's methodology has been demonstrated to establish reliably precisely the proposition for which defendants cited it— that defendants' physics journals, *as measured by cost per character and by cost per character divided by impact factor,* are substantially more cost-effective than those published by plaintiffs. Plaintiffs have proved only the unremarkable proposition that a librarian would be ill-advised to rely on Barschall's study to the exclusion of all other considerations in making purchasing decisions. This consideration in no way makes Barschall's study or defendants' descriptions thereof false, and accordingly judgment is granted to defendants.

It is SO ORDERED.