**NATIONWIDE TARPS, INC. d/b/a NTI Global, a New York Corporation, Plaintiff,**

v.

**MIDWEST CANVAS CORPORATION, an Illinois Corporation, Defendant.**

**No. 00–CV–1895.**

United States District Court, N.D. New York.

Oct. 16, 2002.

Law Office of John W. Sutton, Attorney
for Plaintiff Nationwide Tarps, Inc., Gal-
way, John W. Sutton, Esq.

Carter Conboy Law Firm, Attorneys for Plaintiff Nationwide Tarps, Inc., Albany, Joseph T. Perkins, Esq.

Melvin & Melvin, LLP, Attorneys for Defendant Midwest Canvas Corp., Syracuse, Kenneth J. Brobycki, Esq., Elizabeth A. Genune, Esq., Of Counsel.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

Plaintiff Nationwide Tarps, Inc. ("NTI") commenced the instant action against Defendant Midwest Canvas Corporation ("MCC") asserting claims for violations of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). MCC asserts counterclaims for a violation of section 43(a) of the Lanham Act, defamation, prima facie tort, and unfair competition and trade deception.

NTI has made a motion seeking (1) partial summary judgment on its Lanham Act claims; (2) a preliminary injunction precluding MCC from making certain representations concerning its product; (3) a temporary injunction requiring MCC to recall certain of its products and place them in the possession of a third party to prevent continued damage to NTI and to ensure a source of payment of any damages awarded to NTI; and (4) summary judgment dismissing MCC's counterclaims. MCC opposes.

Oral argument was heard on November 30, 2001, in Albany, New York. Decision was reserved.

## II. FACTS

NTI and MCC are in the business of selling concrete insulating blankets. Concrete insulating blankets are often used for cold weather concreting. Because concrete may not properly cure in low temperatures, during periods of rapid temperature change, or in other adverse weather conditions, concrete insulating blankets are used to hold in the heat of hydration produced by the curing concrete.

Generally speaking, there are two different types of insulation—mass insulation and reflective insulation. (*See* Pl.'s Resp. 7.1 Statement at ¶¶ 23, 25.) Mass insulation restricts the flow of heat through the product's mass. *See* 61 Fed.Reg. 13659 at n. 4. Reflective insulation restricts heat by reflecting back radiant heat and, thus, is installed facing an air space. *See id.;* Pl.'s Resp. 7.1 Statement at ¶ 25. A measurement of insulation's effectiveness is expressed as a "thermal resistance" value or "R" value. *See, e.g.,* 16 C.F.R. § 460.5 ("R-value measures resistance to heat flow."). The higher the R value, the better the product's insulating ability. *See, e.g.,* 16 C.F.R. § 460.12(c).

While NTI and MCC sell some similar products, unlike NTI, MCC sells an insulating blanket, known as its Space Age blanket, that has one or more layers of heat reflective metal foil or aluminized-coated woven polyethylene. MCC began selling its Space Age blankets in or about 1994. MCC claimed, and continues to claim, that its Space Age blankets have rather high R values. Beginning in approximately 1996, MCC placed a product label on certain of its blankets indicating that the Space Age blanket had an R value of 6.32 with the "Reflective Side Down to Concrete." (Oct. 12, 2001, Handwerker Aff. at Ex. GH–6 ("Handwerker Aff.").)) MCC's product literature in or about 1998 stated that its R values were tested with a 3 inch air space. *Id.* at Ex. GH–5. MCC's 2000 product literature states that "Space Age ... with reflective aluminum test out to an R=6.93 using 3″ air spaces." *Id.* at Ex. GH–4. In 2001, MCC's advertising literature provided that "[t]he products were tested for their effective ability to radiate, convect and conduct heat by facing the

products towards a three-inch airspace." *Id.* at GH–3. Since approximately August 2001, MCC has placed a product label on its blankets stating that the product was tested "toward a three-inch air space." *Id.* at GH–7 and GH–8.

In December 2000, NTI commenced the instant action contending that MCC's statements regarding the R value of its products are false and, therefore, violate section 43(a) of the Lanham Act. In January 2001, NTI sent letters to its customers and potential customers, including MCC's customers, stating, in part, as follows:

> NTI Global is concerned that your business may be affected by a dispute between NTI and Midwest Canvas concerning the insulating blankets manufactured by Midwest. The purpose of this letter is to insure that you have notice of the following:
>
> NTI Global has entered into a Federal lawsuit against Midwest Canvas. This lawsuit alleges that Midwest Canvas has intentionally misrepresented the "R" value of their insulating blankets. NTI has and will vigorously pursue this action;
>
> As a part of the Federal legal action, NTI will strongly pursue efforts to correct the false reputation within the marketplace which Midwest has created for its insulating blankets through their misrepresentations; and
>
> NTI's efforts to correct the market may have a negative affect on your business in the event you continue to use the alleged "R" values provided by Midwest. NTI expects that their efforts will lead to publicity directed to construction companies, trade organizations and state governments concerning the misrepresentations made by Midwest.

(Answer at Ex. A.)

In March 2001, MCC filed its Answer to NTI's Complaint. In the Answer, MCC denied that it violated the Lanham Act and asserted counterclaims for defamation, a violation of section 43(a) the Lanham Act, prima facie tort, and unfair competition and trade deception based on NTI's January 2001 letter.

### III. SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The ultimate inquiry is whether a reasonable jury could find for the nonmoving party based on the evidence presented, the legitimate inferences that could be drawn from that evidence in favor of the nonmoving party, and the applicable burden of proof. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining a motion for summary judgment, all inferences to be drawn from the facts contained in the exhibits and depositions "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Hawkins v. Steingut,* 829 F.2d 317, 319 (2d Cir.1987). Nevertheless, "the litigant opposing summary judgment 'may not rest upon mere conclusory allegations or denials' as a vehicle for obtaining a trial." *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980) (quoting *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)).

### IV. DISCUSSION

#### A. NTI's Motion for Summary Judgment on its Lanham Act Claims

NTI contends that MCC has violated the Lanham Act by misrepresenting the

R value of its Space Age blankets. NTI complains that the true R value of the Space Age blankets should reflect only the insulating value of the blankets themselves; not the insulating value of the blankets plus the insulating value of a three inch airspace.

Section 43(a) of the Lanham Act provides, in pertinent part, that:

Any person who, on or in connection with any goods or services ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

To prove a violation of section 43(a), NTI has the burden of demonstrating both that the challenged advertisement is false and that "the defendant[ ] misrepresented an 'inherent quality or characteristic' of the product." *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir.2001) (quoting *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir.1997)). " 'Falsity may be established by proving that (1) the advertising is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse customers.' " *Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir.1995).

In the instant matter, NTI contends that MCC's R value representations are literally false. (*See, e.g.*, Pl.'s Mem. Law [Dkt. No. 23] at p. 5; Pl. Reply Mem. [Dkt. No. 34] at pp. 2–3.) "A plaintiff's burden in proving a literal falsity ... varies depend-

ing on the nature of the challenged advertisement." *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 63 (2d Cir.1992).

Where, as in the current case, defendant's ad explicitly or implicitly represents that tests or studies prove its product superior, plaintiff satisfies its burden by showing that the tests did not establish the proposition for which they were cited.... [A] plaintiff can meet this burden by demonstrating that the tests were not sufficiently reliable to permit a conclusion that the product is superior.

*Id.*

NTI does not argue that MCC's tests do not establish the proposition for which they were cited. (*See* Compl. at ¶ 23 (MCC's "representation concerning the 'R' value of its product when measured with a three inch air space is facially accurate.").) Rather, NTI posits that MCC's tests (American Society of Testing and Materials ("ASTM") methods C 236–89 and C 518–91) are not sufficiently reliable to substantiate its R values because (1) they do not conform to ASTM standards; and (2) they do not replicate the conditions of normal use of the product. MCC responds that (1) its product, a reflective insulation, must be tested with an air space; (2) it is common to use ASTM C 518 to test an insulating product's effective R value taking into consideration an adjoining air space; (3) the tests upon which it relies support the R values claimed in its advertising and product literature; and (4) the tests are reliable and duplicate actual conditions of use. (*See, e.g.*, Oct. 11, 2001, Troyer Aff. ¶¶ 7, 13, 15, 16, 18 ("Troyer Aff.").)

The parties agree that there is no specific ASTM test standard for determining the thermal resistance of an insulating concrete blanket. (*See* Pl's Resp. 7.1 Statement at ¶ 17.) NTI's argument is based,

in part, on the statement of its proffered expert witness, Timothy Kunz. Mr. Kunz was asked "whether such a test, if conducted in accordance with ASTM Method C518 (91) would result in a true 'R' value of the material without a three inch air space." (Aug. 17, 2001, Kunz Aff. at ¶ 6 ("Kunz Aff.").) Mr. Kunz opined that the testing method used by MCC (ASTM Method C 518–91) "does not include a three inch air space with the material being tested when used to measure the true 'R' value. Any statement or claim of thermal resistance value derived from testing with an additional air space is not an accurate account of the true 'R' value of the product." *Id.* In essence, NTI's proffered expert is merely restating NTI's basic argument that MCC should test the R value of the blanket itself; not the blanket in conjunction with the air space.

Kunz's affidavit does not state that ASTM C518 cannot, or should not, be used to determine the R value of reflective insulation. (*See generally* Kunz Aff.) Moreover, his affidavit does not state that, when taking into consideration the three inch air space, MCC's R values were incorrectly determined. In addition, Kunz does not discuss MCC's 1996 test which was conducted in accordance with ASTM C 236–89. Further, Mr. Kunz's affidavit was in response to a pointed question guaranteed to give NTI the response it wanted. His affidavit simply can be interpreted to state that using C 518 to determine the R value

of the Space Age blanket plus a three inch air space will not give you the R value of the blanket without the three inch air space, something that nobody questions.[1] *Id.* at ¶¶ 6–7. The real question is whether MCC's use of these tests and/or its testing methodology is unreliable.

MCC submitted the affidavit of one if its proffered experts, Richard Troyer, that states that using ASTM C518 is "a technically correct and fair way to represent the thermal properties of reflective insulation provided that the test report accurately presents how the testing was performed." (Troyer Aff. at ¶ 7.) The evidence in the record suggests that MCC has made available its testing procedures and results since 1996. (*See* Def.'s Resp. 7.1 Statement at ¶¶ 23–24; Handwerker Aff. at ¶ 16; Oct. 10, 2001, Anderson Aff. at Ex. DA–1.) Since 1998, MCC's advertising literature has disclosed the fact that its R value tests were performed using ASTM C 518–91 with a three inch air space. (*See* Handwerker Aff. at ¶ 14 & Exs. GH–3, GH–4, GH–5, GH–7, and GH–8.)[2] Looking at the evidence in the record in the light most favorable to MCC, a fair-minded trier of fact could reasonably conclude that MCC utilized a reliable testing methodology to ascertain the effective R value of its Space Age blankets.

This conclusion is substantiated by the Federal Trade Commission's ("FTC") R-value Rule that applies to the labeling and

---

1. Kunz's affidavit suggests that the R value of the material alone is the product's true R value. (Kunz Aff. at ¶¶ 6–7.)

2. The evidence in the record suggests that in 1996, MCC's testing was conducted in accordance with ASTM C 236–89. In 1997, MCC began using ASTM C 518. Prior to 1998, it appears that MCC did not disclose the full basis for its R value determinations (i.e., that it was tested with a three inch air space). In

light of the parties' stipulation whereby NTI waived its right to seek monetary damages in the form of lost profits but did not waive its rights to seek post-judgment advertising costs and attorneys fees (*see* Stip.;Order Dkt. No. 46) and the fact that MCC made available all of its test results since 1996 which indicated the bases for the results, MCC's prior advertising practices are largely irrelevant for purposes of the pending motions.

advertising of home insulation.[3] *See* 16 C.F.R. Part 460.

The R-value Rule requires that thermal insulation manufacturers and other sellers disclose the thermal performance of their products, based on uniform testing procedures adopted by the thermal insulation industry. The purpose of th[e] Rule is to provide consumers with information about thermal insulation products, based on uniform standards, that allows them to make meaningful, cost-based purchasing decisions among competing products.

64 Fed.Reg. 48024 (Sept. 1, 1999). This rule is instructive for several reasons.

First, the rule mandates uniform standards in the home insulation market, but not in the commercial insulation market. Contractors and engineers who purchase the parties' concrete insulating blankets are likely to be more sophisticated with regard to R values than the average home owner and, thus, are likely to understand (or be less confused) by MCC's R value claims. Second, the R value rule applies to both mass and reflective insulation. Significantly, provided testing is performed in accordance with the dictates of the rule, 16 C.F.R. § 460.5(d) specifically permits determining an R value in conjunction with an air space. The fact that the FTC expressly permits such testing tends to contradict NTI's argument that a product's R value should not be determined in conjunction with an air space. Third, the types of testing required by §§ 460.5(a) and 460.5(d) are some of the same ones utilized by MCC—ASTM C 236–89 and ASTM C 518–91.[4] Fourth, the rule applicable to the labeling of home insulation products provides that

For insulation materials with foil facings, ... [y]ou can ... show the R-value of the insulation when it is installed in conjunction with an air space. This is its "system R-value." If you do this, you must clearly and conspicuously state the conditions under which the system R-value can be attained.

16 C.F.R. § 460.12(b)(6). In the instant matter, MCC disclosed both the conditions under which its claimed R values can be obtained (i.e., using either ASTM C 236 or C 518 with a three inch air space) and, more recently, that the resulting R value was its "effective" R value. (*See, e.g.,* Handwerker Aff. at Exs. GH–1, GH–7, and GH–8.) The test reports that MCC made available to customers similarly indicate the R value for the "total system" or the "effective thermal resistance." (*See, e.g.,* Oct. 10, 2001, Anderson Aff. at Exs. DA–1, DA–2, DA–3, DA–4, DA–5, and DA–6.) Based on the foregoing, a fair-minded trier of fact could reasonably conclude that MCC's testing methodology and the resulting "effective", or system, R value rating together with its disclosure of its testing procedure are reliable and true.

NTI next argues that the American Concrete Institute ("ACI") maintains standards for the R value of materials used to

---

**3.** There is nothing in the record suggesting that the parties are subject to 16 C.F.R. Part 460 or that those rules are otherwise applicable here. Nevertheless, these regulations, of which judicial notice may be taken, tend to substantiate MCC's position, further demonstrating that summary judgment in favor of NTI is not warranted.

**4.** 16 C.F.R. § 460.5(d) requires that the testing of reflective insulation in conjunction with an air space be performed in conformance with ASTM C 236–89. MCC performed one test utilizing C 236–89 in 1996, but all other tests were performed using ASTM C 518–91. The fact that MCC used C 518 is not fatal to its position because MCC does not appear to be subject to Part 460 and NTI has not conclusively demonstrated that MCC's use of that test is unreliable.

protect concrete during cold weather curing. NTI points out that the ACI's materials do not refer to a three inch air space "and therefore do not allow for a three inch air space." (Aug. 9, 2001, Deno Aff. at ¶ 8.) MCC responds that "the actual ACI Standard Specification for cold weather concreting (ACI 306.1–90) ... is completely silent as to placement of insulation." (Oct. 10, 2001, Buck Aff. at ¶ 33 ("Buck Aff.").)

The ACI's *Practitioner's Guide To Cold Weather Concreting* (the "Guide") submitted by NTI lists various types of insulating materials, but does not discuss reflective insulation. (*See* Dkt. No. 22, at pp. 21–22.) The Guide notes that "[i]nsulation must be kept in close contact with the concrete or the form surface to be effective." *Id.* at 21. The Guide, however, states that "[t]he actual temperature at the concrete surface determines the effectiveness of protection, regardless of air temperature," *id.* at 12, and, thus, "[u]sing these temperature records, appropriate modifications can be made to the protection method or selected materials." *Id.* at 22. Considering the Guide in its totality, a fair-minded trier of fact could reasonably conclude that the Guide does not purport to dictate how R values are calculated or what types of products must be used to achieve specific R values. To the contrary, the tables in the Guide "indicate the minimum ambient air temperatures to which concrete walls or slabs of different thicknesses may be exposed for different values of thermal resistance R, for different cement contents, and protection periods of 3 or 7 days." *Id.* The Guide's tables may very well apply to any type of insulation (mass or reflective) that provides the appropriate R value referenced in the table. Thus, for example, if the table states that insulation with an R value of 4 would be sufficient to protect a 30 inch slab of concrete with a cement content of 400 pounds per cubic yard at a minimum temperature of zero degrees for three days on ground at 35 degrees Fahrenheit (*see* Def.'s Resp. 7.1 Statement at ¶ 16; Dkt. No. 22 at p. 25, Table 7.3.3), it may not matter whether that thermal resistance factor is obtained using mass insulation applied directly to (or near) the concrete or reflective insulation supported three inches from the concrete. As long as the result is the same, the means of getting there may be of no matter. Moreover, the Guide specifically notes that "[t]he thermal resistance of the various insulating materials [in Table 7.3.5—Thermal resistance of various materials] have been calculated under the assumption that the insulation is applied to the exterior surfaces of steel forms." *Id.* This leaves open the possibility that the ACI itself recognizes that R values differ depending upon how the insulation is applied in relation to the concrete surface.

NTI also raises the issue of whether MCC's tests duplicate actual conditions of use. NTI contends that, in the real world, insulation is applied directly to the concrete. MCC, however, has supplied affidavits stating that insulating blankets do not ordinarily come into direct contact with the concrete because, among other reasons, they can damage a finished surface. (*See* Buck Aff. at ¶ 12; Oct. 10, 2001, Novelli Aff. at ¶¶ 8, 12, 13 ("Novelli Aff.").) One of MCC's proffered witnesses, Michael Buck, states that

A competent contractor, when insulating a flat surface, will erect a lattice type system over the concrete by carefully laying wooded two-by-fours on top of the finished surface. The insulating blankets are then dragged over the wooden supports.... The elevations of the blankets by the wooden supports not only protects the surface from being scratched or marred where the blankets are dragged over the work, it also pro-

vides an air space between the insulating material and the concrete.

*Id.* at ¶ 13; *see also* Novelli Aff. at ¶ 13. In light of this conflicting testimony, a fair minded trier of fact could reasonably conclude that MCC's tests reflect the real world application of insulating blankets.[5]

For the foregoing reasons, NTI has failed to satisfy its burden of demonstrating an absence of genuine issues of material fact that MCC's claimed R values are literally false.

## B. *NTI's Motion for a Preliminary Injunction*

█ To obtain a preliminary injunction, NTI must demonstrate "'(a) that it will suffer irreparable harm if relief is denied, and (b) either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships decidedly tipping in plaintiff's favor.'" *Castrol, Inc.*, 977 F.2d at 62.

For the reasons previously discussed, NTI has failed to demonstrate a likelihood of success on the merits entitling it to injunctive relief. The evidence in the record suggests that MCC uses a reliable testing methodology and discloses the effective R value of its products and the methodology and conditions used to determine and achieve that effective R value. Similarly, NTI has failed to demonstrate sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly in its favor.

## C. *NTI's Motion for a Temporary Injunction*

█ NTI also moves for a temporary injunction directing MCC to "immediately recall all concrete insulating blankets now on the market and ... secure and store such blankets as security for the faithful performance of any judgment of this Court which might hereafter be entered." NTI has provided no reasons or evidence substantiating its need for such an extraordinary measure. NTI waived its right to all damages except money damages for post-judgment advertising and attorneys fees. There is nothing in the record suggesting that, if NTI succeeds in this action, MCC will be unable to fulfill any such obligations for post-judgment advertising or attorneys' fees or that it has any intent to avoid a lawfully entered judgment against it. Moreover, such a drastic remedy is not warranted on the facts of this case where it is far from clear that NTI will ultimately be successful on its claims.

## D. *NTI's Motion for Summary Judgment Seeking Dismissal of MCC's Counterclaims*

NTI also moves for summary judgment seeking dismissal of MCC's counterclaims. NTI argues that its January 30, 2001 letter is subject to the absolute privilege under N.Y. Civ. Rights Law § 74 and/or the common interest qualified privilege and that the claim for *prima facie* tort should be dismissed because there is no evidence of disinterested malevolence. MCC counters that section 74 does not apply to out of state publications, NTI's letter is not a fair and true report of the

---

**5.** Moreover, industry standard is not necessarily the be all and end all of insulating blankets. If, in fact, MCC has a product that achieves a higher R value by utilizing a different method of placing the blanket (e.g., by ensuring a three inch air space between the blanket and the concrete surface), there is no reason why a contractor could not prepare the necessary air space to achieve the desired thermal rating.

judicial proceedings in this matter, and NTI published the letter with malice.

### 1. Whether Section 74 Applies to Out of State Publications [6]

In *Murray v. Brancato*, 290 N.Y. 52, 48 N.E.2d 257 (N.Y.1943), the New York Court of Appeals found that section 337 of the Civil Practice Act (which is now section 74 of the Civil Rights Law) did not extend absolute immunity to judges for opinions they authored and sent to "unofficial" reporters. The court further stated that "[i]n no event could the statute confer immunity for publication outside the State." Forty-two years later, in *Beary v. West Publishing Co.*, 763 F.2d 66 (2d Cir.) (1985), the Second Circuit disavowed *Murray* in part and held that section 74 provides an absolute immunity to both the "official" and "unofficial" publishers of New York state judicial opinions. Although the Second Circuit noted that Minnesota, where West's reports were published, had a similar statute granting an absolute privilege to reports of judicial proceedings, *Beary* made no mention of

*Murray*'s statement that section 74 does not apply to publication outside of New York. *Beary*, 763 F.2d at 69 n. 1. Despite the fact that West was an out-of-state publisher, the Second Circuit affirmed the granting of West's motion for summary judgment based on section 74's absolute immunity. No other cases have discussed *Murray*'s limitation of the statute to instate publication.

In light of *Beary* and the change of focus in conflict of law analysis in New York State,[7] *Murray* is not the current law in New York. Section 74 confers immunity to all defamation claims brought pursuant to New York law where the terms of that statute are otherwise satisfied.[8]

### 2. Whether NTI's Publication Is Absolutely Privileged Under Section 74

■ Section 74 of the New York Civil Rights Law provides in relevant part that "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report

---

6. The ensuing discussion regarding MCC's defamation claim assumes, without deciding, that the letter contains false, defamatory material. Neither party has addressed these necessary prerequisites to a defamation claim.

7. Traditionally, in choice of law problems involving torts, New York courts applied *lex loci delicti* (the law of the place of the tort). *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 71–72, 595 N.Y.S.2d 919, 612 N.E.2d 277 (N.Y. 1993). This may well explain the Court of Appeal's statement in *Murray* that the statute could not confer immunity for out of state publications (i.e., Minnesota law would apply where the writing at issue was published in Minnesota). *See Murray*, 290 N.Y. at 59, 48 N.E.2d 257 ("In no event could the statute confer immunity for publication outside the State, and though we may presume that in Minnesota, where the New York Supplement is published, the common-law rule exists which denies to an aggrieved person a right

of action without proof of actual malice there is no allegation or proof that absolute immunity has been conferred by any statute there."). Now, however, New York applies the "interests analysis." *Cooney*, 81 N.Y.2d at 72, 595 N.Y.S.2d 919, 612 N.E.2d 277. Under the interests analysis, courts frequently apply the law of the defamation plaintiff's home state. *See Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir.1999) ("Under New York choice-of law rules in defamation cases the state of the [defamation] plaintiff's domicile will usually have the most significant relationship to the case, and its law will therefore govern.") (internal quotation marks omitted).

8. Although MCC contends that NTI should have pleaded "the equivalent to Civil Rights Law § 74 for every state in which the letter was published" (MCC's Mem. Law [Dkt No. 41] at 6) neither party has addressed any conflict of laws issues.

of any judicial proceeding ... which is a fair and true headnote of the statement published." For a report to be "fair and true," it must be substantially accurate. *Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 49 N.Y.2d 63, 67, 424 N.Y.S.2d 165, 399 N.E.2d 1185 (N.Y.1979).

> The test is whether the published account of the proceeding would have a different effect on the reader's mind than the actual truth, if published. . . . If the published account, along with the rest of the [publication], suggests more serious conduct than that actually suggested in the official proceeding, then the privilege does not attach, as a matter of law.

*Daniel Goldreyer, Ltd. v. Van de Wetering*, 217 A.D.2d 434, 436, 630 N.Y.S.2d 18 (1st Dep't 1995) (citations omitted). "The defamatory potential of a particular ... statement is to be ascertained by considering the challenged publication in its entirety; only after doing so can one then determine whether, and to what extent, the falsehood affects the overall impression left on the average reader." *Fraser v. Park Newspapers of St. Lawrence, Inc.*, 246 A.D.2d 894, 895–96, 668 N.Y.S.2d 284 (3d Dep't 1998).

■ The statements in the January 30, 2001 letter of which MCC complains are that (1) NTI "is concerned that your business may be affected by a dispute between NTI and Midwest Canvas concerning the insulating blankets manufactured by Midwest;" (2) NTI "will strongly pursue efforts to correct the false reputation within the marketplace which Midwest has created for its insulating blankets through their misrepresentations; (3) "NTI's efforts to correct the market may have a negative affect on your business in the event you continue to use the alleged 'R' values provided by Midwest;" and (4) NTI expects that their efforts will lead to publicity directed to construction companies, trade organizations and state government." [9]

With the possible exception of the first sentence of the letter, the first three paragraphs of the letter fall within section 74's protection. Those paragraphs are a substantially accurate summary of the bases of the instant litigation—that NTI claims that MCC has achieved a false reputation in the concrete insulating market by misrepresenting the R values of its blankets. Overall, however, the letter suggests more serious conduct than that alleged in this litigation and could have a different effect on the mind of the reader than would the actual truth. For example, the letter opens with a subtle threat and/or warning that "NTI is concerned that your business may be affected by a dispute between NTI and Midwest Canvas." Although, in isolation, this sentence is innocuous, read in conjunction with the remainder of the letter, a reasonable reader could be led to believe that the litigation could have a detrimental impact on their business. The seventh sentence of the letter gives cause for the greatest concern in this regard.[10] Although the meaning of that sentence is obfuscated, it could reasonably be interpreted to imply the existence of facts concerning MCC's products not alleged in, and not part of, NTI's Complaint. For example, a reader could reasonably conclude that MCC's R values are simply false and, thus, by continuing to use MCC's products, the reader may be jeopardizing

---

9. The relevant portions of the letter have been set forth in their entirety *supra* at p. 205.

10. That sentence states that "NTI's efforts to correct the market may have a negative affect on your business in the event you continue to use the alleged 'R' values provided by Midwest."

the quality of their concrete work because their concrete is not curing under the proper conditions. Moreover, by stating that NTI's efforts will lead to publicity directed to construction companies, trade organizations and state governments, readers using the Space Age blanket may believe that these companies or governments with which they might have contracts may call into question their use of such blankets and the resulting quality of their concrete work. NTI's Complaint mentions nothing about how the continued use of MCC's R values "may have a negative affect [sic] on [the user's] business." The only business alleged to be harmed, or likely to be harmed, in the Complaint is that of NTI. Considering the letter in its totality, a reader could reasonably conclude that their continued reliance on MCC's R values could have a detrimental impact on his or her business. Because the January 30, 2001, letter goes beyond a substantially accurate report of this litigation and could have an effect on the reader's mind different from the truth, NTI is not entitled to the protection of section 74.

Relying on section 74's absolute privilege, NTI also seeks summary judgment on MCC's claims of *prima facie* tort, unfair competition and a violation of the Lanham Act. In light of the foregoing discussion, NTI's motion in this regard must be denied.

### 3. *Whether NTI Is Entitled to the Common Interest Privilege*

█ NTI next argues that it is entitled to the qualified, common interest privilege because it had a common business interest with the recipients of its letter. The common interest privilege applies to communications "fairly made by a person in the discharge of some public or private duty, legal or moral, or in the conduct of his own affairs, in a matter where his interest is

concerned." *Toker v. Pollak,* 44 N.Y.2d 211, 219, 405 N.Y.S.2d 1, 376 N.E.2d 163 (N.Y.1978). "If the information is given in good faith by an individual who believes the information to be true, he is protected against the imposition of liability in a defamation action." *Id.* at 221, 405 N.Y.S.2d 1, 376 N.E.2d 163. "Only those who act out of malice, rather than public interest, need hesitate before speaking." *Id.*

The burden of demonstrating malice rests on the defamation plaintiff. *Liberman v. Gelstein,* 80 N.Y.2d 429, 437, 590 N.Y.S.2d 857, 605 N.E.2d 344 (N.Y.1992). Malice can be demonstrated by showing that either (1) the defamation defendant made the statement with actual knowledge that it was false or with a reckless disregard of whether it was false (constitutional malice); or (2) the statement was made out of spite or ill-will (common law malice). *Id.* Spite or ill will refers not to the writer's general feelings about the defamation plaintiff, but the writer's motivation for making the alleged defamatory statement. *Id.* at 439, 590 N.Y.S.2d 857, 605 N.E.2d 344. "[A] triable issue is raised only if a jury could reasonably conclude that malice was the one and only cause for the publication." *Id.* (internal quotation and citation omitted).

NTI's letter arguably is on a subject in which it and the end users and retailers of concrete insulating blankets have a common interest (e.g., economic interests and interests in the R values of concrete insulating blankets). NTI has an interest in explaining the instant litigation and informing potential customers of MCC's potentially misleading tactics. Thus, absent evidence of malice, NTI is entitled to the qualified privilege.

MCC has made no showing that NTI made any statements knowing them to be false or with a reckless disregard of their truth or falsity. Rather, MCC contends

that NTI published the January 30, 2001, letter out of spite and/or ill will. The true meaning and intent of the letter is somewhat mysterious. It is unclear why it was written. On the one hand, it would be entirely benign if NTI wrote the letter to bring to the concrete industry's attention the fact that the parties are in litigation and that NTI believes that MCC misrepresents its R values by including the thermal resistance of its blankets together with the air space. On the other hand, if the letter was written in an attempt to threaten and/or scare away MCC's customers by falsely impugning MCC's products, then a fair-minded trier of fact could reasonably conclude that the letter was written with malice, thereby destroying the common interest privilege.

NTI contends that it wrote the letter to protect its business interests. New York courts have held, however, that protecting one's business interests alone may not sustain the qualified privilege. *See Rupert v. Sellers*, 65 A.D.2d 473, 411 N.Y.S.2d 75, 82 (4th Dep't 1978) ("There just is no qualified privilege to make a defamatory attack merely to protect one's business interests."). The befuddling nature of NTI's letter muddies its purpose and whether it was written with common law malice. Although the letter purports to be informative, it is sufficiently cryptic to leave open the possibility that it was written with malice. For example, although the letter identifies that there is a dispute and that NTI believes that MCC has misrepresented its R values, it does not explain why NTI believes MCC's R values to be untrue or misleading. That, of course, is the crux of this litigation and would have been most informative to readers. After a cursory recitation of the basis of the litigation, the letter goes on to state that the reader's business could somehow be negatively affected and that there will be publicity. The letter does not state how the reader's

business could be affected or what type of publicity is to be expected. In its totality, the letter can reasonably be interpreted as a threat and/or scare tactic aimed at taking away some of MCC's customers by suggesting potentially false facts not set forth in the letter or in the Complaint. "That [NTI] uttered the [alleged] defamatory matter [to persons with whom it arguably had a common interest] does not necessarily mean that ... [it] did so to advance [their] interests. [NTI] may have been acting duplicitously while motivated solely by [its] ill will towards [MCC]." *Stukuls v. State of New York*, 42 N.Y.2d 272, 282, 397 N.Y.S.2d 740, 366 N.E.2d 829 (1977). While MCC has an uphill battle to prove that NTI acted out of malice, on the record presented, NTI's motivation for drafting and sending the letter is a factual determination that cannot be resolved as a matter of law. *See id.* at 282, 397 N.Y.S.2d 740, 366 N.E.2d 829.

### E. *Whether MCC's Claim of Prima Facie Tort Must Be Dismissed as a Matter of Law*

■ Lastly, NTI contends that MCC's claim of prima facie tort must be dismissed because there is no evidence from which a trier of fact could reasonably conclude that NTI was motivated solely by disinterested malevolence. MCC responds that, at the time it responded to NTI's motion for summary judgment, it had not had an opportunity to complete discovery on this issue and, therefore, this issue is premature.

The elements of a cause of action for prima facie tort are (1) intentional infliction of harm; (2) resulting in special damages; (3) without excuse or justification; and (4) by an act or series of acts that would otherwise be lawful. *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 332, 464 N.Y.S.2d 712, 451

N.E.2d 459 (N.Y.1983). "[T]here is no recovery in prima facie tort unless malevolence is the sole motive of defendant's otherwise lawful act, or in Justice Holmes' characteristically colorful language, unless defendant acts from 'disinterested malevolence.'" *Id.* (quoting *American Bank & Trust Co. v. Federal Bank,* 256 U.S. 350, 358, 41 S.Ct. 499, 65 L.Ed. 983 (1921)). "[T]he genesis which will make a lawful act unlawful must be a malicious one unmixed with any other and exclusively directed to injury and damage of another." *Id.* (quoting *Beardsley v. Kilmer,* 236 N.Y. 80, 90, 140 N.E. 203 (N.Y.1923)). While NTI ultimately may prove that it did not act with malice or had mixed motives for sending the letter thereby defeating MCC's claim of prima facie tort, for reasons similar to those discussed above, triable issues of fact remain regarding whether the letter was written solely out of disinterested malevolence.

## V. CONCLUSION

NTI has failed to sustain its burden of demonstrating an absence of genuine issues of material fact regarding whether MCC's R value tests are reliable. NTI has similarly failed to sustain its burden of demonstrating a likelihood of success on the merits or sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships decidedly tipping in plaintiff's favor. NTI also has not demonstrated that it is entitled to a temporary injunction requiring MCC to recall all of its products and place them with a disinterested third party. NTI is not entitled to the absolute privilege provided by N.Y. Civ. Rights Law § 74. Finally, triable issues of fact remain regarding whether NTI acted with malice and/or disinterested malevolence when it sent the January 30, 2001, letter.

Accordingly, it is

ORDERED that:

1. NTI's motion for partial summary judgment on its Lanham Act claim is DENIED;

2. NTI's motion for a preliminary injunction is DENIED;

3. NTI's motion for a temporary injunction is DENIED; and

4. NTI's motion for summary judgment on MCC's counterclaims is DENIED.

IT IS SO ORDERED.