**RECKITT BENCKISER INC., Plaintiff,**

v.

**MOTOMCO LTD., Defendant.**

No. 10 Civ. 6228(RJS).

United States District Court, S.D. New York.

Jan. 19, 2011.

Randall K. Miller, Nicholas M. DePalma, Marcus Asner, Arnold & Porter LLP, McLean, VA, Lead Counsel for Plaintiff.

Gregory T. Everts, Josephine K. Benkers, Quarles & Brady LLP, Madison, WI, Lead Counsel for Defendant.

## MEMORANDUM AND ORDER

RICHARD J. SULLIVAN, District Judge:

Plaintiff Reckitt Benckiser Inc. brings this suit against Defendant Motomco Ltd., seeking to enjoin Defendant from making certain statements about Plaintiff's products—particularly, statements concerning potential federal and state regulatory actions that may require both parties to stop selling several of their products. Defendant has asserted counterclaims, seeking to enjoin Plaintiff from making certain statements about the impact of those same potential regulatory actions. Before the Court are the parties' cross motions for a preliminary injunction. For the reasons that follow, the Court grants in part and denies in part both parties' motions.

### I. BACKGROUND [1]

This action is about various statements the parties, manufacturers of competing rodenticide brands, have made concerning (1) the "Risk Mitigation Decision for Ten Rodenticides" (the "RMD") released by the United States Environmental Protection Agency (the "EPA") on May 28, 2008 (*see* Plaintiff's Exhibit ("PX") 24), and (2) the planned response of the New York State Department of Environmental Conservation ("NYSDEC") to the RMD (*see* PX–27, PX–32). Plaintiff is the producer of the d-CON brand of rodenticides and Defendant makes a competing brand called Tomcat. Both brands are sold in New York State.

In the RMD, the EPA outlined risks associated with certain active ingredients used in rodenticides. The RMD stated that products intended for individual consumers containing a type of active ingredient—"second-generation anticoagulants"—should no longer be sold to individual consumers and that all consumer-size rodenticide bait products must be sold with a bait station. (*See* PX–24 at 11–14.) The EPA asked manufacturers to voluntarily comply with the RMD and warned of possible future regulatory actions. (*See id.* at 25; *see also* PX–25 at 1.) In a letter dated October 9, 2010, NYSDEC announced that it would no longer register new products that failed to comply with the RMD. (*See* PX–27 at 1.) NYSDEC also stated that it would "discontinue the registration of any rodenticide products that do not comply with the decision at their next renewal." (*Id.* (emphasis omitted).) In February 2010, NYSDEC informed companies that it intended to not continue the registration of "second-generation anticoagulant rodenticide products packaged as pelleted, loose baits and meal" "after June 4, 2011 unless acceptable updated final product labeling consistent with the requirements of the [EPA's] Risk Management Decision [was] submitted to the Department." (*See* PX–32 at 1.)

Defendant has decided to voluntarily comply with the RMD. (*See* Supplemental Declaration of Patrick Barry, Nov. 5, 2010, Doc. No. 41–1 ¶ 3.) Plaintiff, by contrast,

---

**1.** The Court assumes the parties' familiarity with the facts of this case and will only recount the facts relevant to this decision.

has opted to fight the EPA in court, having filed a lawsuit in the United States District Court for the District of Columbia. *See* Complaint, *Reckitt Benckiser Inc. v. Jackson,* No. 09 Civ. 445 (D.D.C. March 6, 2009), ECF No. 1; *see also* PX–28 at 2 (letter by Plaintiff to EPA). Not surprisingly, both sides are presenting their opinions on the impact of the EPA and NYS-DEC actions to buyers for major retail chains. Among other actions, Defendant has distributed to retail buyers two "White Papers." (*See* PX–1, PX–3.) One White Paper has the heading "NEW YORK STATE DEPARTMENT OF ENVIRON-MENTAL CONSERVATION (NYS-DEC)" and contains contact information for two NYSDEC officials. (*See* PX–1.) The other has the heading "EPA Rodenticide Mitigation Decision" and includes photocopies of two EPA officials' business cards. (*See* PX–3.) Neither White Paper identifies Defendant as its author.

On August 19, 2010, 2010 WL 3418493, Plaintiff filed its Complaint, alleging that Defendant was engaged in false advertising in violation of the Lanham Act. Among other things, Plaintiff sought a temporary restraining order and preliminary injunction. Specifically, Plaintiff asked the Court to enjoin Defendant from: (1) using the White Papers, (2) making "any statement that, directly or indirectly, suggests that d-CON® has been subject to adverse regulatory action," and (3) making any statement that suggests "that retailers who choose to carry d-CON® will experience a disruption to its business, loss of revenue, quarantine of products, or substantial fines and penalties or any words to that effect." (*See* Compl. at 10.) In an Order dated August 19, 2010, the Court denied Plaintiff's application for a temporary restraining order.

Defendant filed its answer, counterclaims, and cross motion for a preliminary injunction on September 8, 2010. Defendant's cross motion asked the Court to enjoin Plaintiff from representing that (1) "Motomco has voluntarily cancelled its current registrations for pre-mitigation consumer rodenticide products," (2) "Reckitt has a special exemption or exception from the EPA allowing it to sell pre-mitigation consumer rodenticides to retailers after June 4, 2011, and/or that no other rodenticide manufacturer has such an exemption," (3) "Reckitt's registrations for d-CON products will remain valid and the products can be legally sold by Reckitt after June 4, 2011," (4) "Reckitt can continue to sell second-generation consumer rodenticides after June 4, 2011 or is otherwise entitled to not comply with the provisions of the EPA Risk Mitigation Decision and NYSDEC implementation thereof," (5) "the EPA has been or will be enjoined from cancelling Reckitt's registrations for pre-mitigation rodenticides and/or from declaring such products misbranded after June 4, 2011, and/or from otherwise enforcing the Risk Mitigation decision (unless such an injunction has actually been entered by a court of competent jurisdiction and is in effect at the time of such representation)," and (6) "retailers will suffer no adverse consequences from purchasing or committing to purchase d-CON pre-mitigation products for the year 2011." (*See* Def.'s Notice of Mot. for Prelim. Inj. at 2–3.)

## II. Discussion

### A. Legal Standard

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council,* 555 U.S. 7, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008);

see *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir.2010) (internal quotation marks omitted).[2] A preliminary injunction is an "extraordinary remedy" that should not be routinely granted. *JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79, 80 (2d Cir.1990). The party seeking the injunction carries the burden of persuasion to demonstrate, "by a clear showing," that the necessary elements are satisfied. *See Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997).

### B. The Lanham Act

The Lanham Act expressly forbids false or misleading descriptions or representations of fact concerning "the nature, characteristics, qualities, or geographic origin of ... goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). "A claim for false advertising under the Lanham Act may rest on one of two theories: (1) that the 'challenged advertisement is literally false, *i.e.*, false on its face,' or (2) 'that the advertisement, while not literally false, is nevertheless likely to mislead or confuse customers.'" *Tiffany (NJ) Inc. v. eBay, Inc.*, No. 04 Civ. 4607(RJS), 2010 WL 3733894, at \*1 (S.D.N.Y. Sept. 13, 2010) (quoting *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 112 (2d Cir.2010)). "Under either theory, the plaintiff must also demonstrate that the false or misleading representation involved an inherent or material quality of the product." *Time Warner Cable, Inc. v. DI-RECTV, Inc.*, 497 F.3d 144, 153 n. 3 (2d Cir.2007).[3] While the "language of the Act cannot be stretched so broadly as to encompass all commercial speech," the Act does "encompass[ ] more than the traditional advertising campaign." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir.2002); *see also Seven–Up Co. v. Coca–Cola Co.*, 86 F.3d 1379 (5th Cir.1996) (applying Act to presentations made by soft drink manufacturer to bottlers); *Nat'l Artists Mgmt. Co. v. Weaving*, 769 F.Supp. 1224 (S.D.N.Y. 1991) (applying Act to phone calls made to clients of a theatrical booking agency by a former employee starting a competitor). "[T]he touchstone of whether a defendant's actions may be considered 'commercial advertising or promotion' under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market. Proof of widespread dissemination within the relevant industry is a normal concomitant of meeting this requirement." *Fashion Boutique*, 314 F.3d at 57.

### C. Irreparable Harm

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233–34 (2d Cir.1999) (citation and internal quotation marks omitted). Because of this, "the moving party must

---

**2.** Before the Supreme Court announced its decision in *eBay v. MercExchange, L.L.C.*, 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006), the Second Circuit had traditionally used a slightly different test focusing on the first two of these items only, *see Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 152–53 (2d Cir.2007). The Second Circuit has not explicitly said that the *eBay* standard applies to false advertising cases under the Lanham Act, but has stated in *dicta* that it "see[s] no reason that *eBay* would not apply with equal force to an injunction in any type of case." *Salinger*, 607 F.3d at 78 n. 7. The parties have both cited *Salinger* as providing the applicable standard in their briefs, so the Court will include the last two elements in its analysis, though neither affects the outcome of this case.

**3.** The lawfulness of a product is clearly a material quality, so the Court will not discuss this factor in detail in this Memorandum and Order.

first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Id.* at 234 (citations and internal quotation marks omitted). In order to demonstrate irreparable harm, a plaintiff must show an injury that is "actual and imminent" and that "cannot be remedied by an award of monetary damages." *Shapiro v. Cadman Towers, Inc.,* 51 F.3d 328, 332 (2d Cir. 1995) (citation and internal quotation marks omitted); *accord Moore v. Consol. Edison Co. of N.Y., Inc.,* 409 F.3d 506, 510 (2d Cir.2005) ("Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances."). If the movant fails to make a showing of irreparable harm, the motion for a preliminary injunction must fail. *See Rodriguez,* 175 F.3d at 234.

■■■■ In a case involving a claim of false advertising under the Lanham Act, "[i]n general, 'the likelihood of injury and causation will not be presumed, but must be demonstrated in some manner.'" *Time Warner,* 497 F.3d at 161 (quoting *Coca-Cola Co. v. Tropicana Prods., Inc.,* 690 F.2d 312, 316 (2d Cir.1982)). However, irreparable injury *may* be presumed when a plaintiff demonstrates the literal falsity of a defendant's comparative advertisement mentioning the plaintiffs product by name. *See id.* at 161–62 (quoting *Castrol, Inc. v. Quaker State Corp.,* 977 F.2d 57, 62 (2d Cir.1992)). "This is because a false 'comparison to a specific competing product necessarily diminishes that product's value in the minds of the consumer.'" *Id.* at 162 (quoting *McNeilab, Inc. v. Am. Home Prods. Corp.,* 848 F.2d 34, 38 (2d Cir.1988)). Even where an advertisement does not explicitly identify a competing product by name, the presumption may still be applicable where "the plaintiff is an obvious competitor with respect to the misrepresented product." *Id.* (quoting *Hutchinson v. Pfeil,* 211 F.3d 515, 522 (10th Cir.2000)).

Here, the parties are obvious competitors with respect to each other's allegedly misrepresented products and the allegedly false statements were made in the context of advertising campaigns directly referencing, and indeed aimed at, the opposing manufacturer's products. For example, on August 12, 2010, Defendant's Northeast Retail Sales Manager sent the NYSDEC White Paper to an outside sales representative, instructing him to send it to a buyer at a supermarket chain to demonstrate that "d-CON is on the Titanic." (*See* PX–44, PX–46; *see also* PX–39 (EPA White Paper).) Similarly, Plaintiff directly referred to Defendant in its statements, by, for example, telling a buyer that "Motomco was voluntarily cancelling its registrations." (*See* Declaration of Michael Rosen, Sept. 7, 2010, Doc. No. 18 ("Rosen Decl.") ¶ 7.) Irreparable injury is therefore fairly presumed under longstanding precedent in this Circuit. *See SimplexGrinnell LP v. Integrated Systems & Power, Inc.,* 642 F.Supp.2d 167, 204 (S.D.N.Y.2009).

Although neither party has argued as much, it may be that this presumption of irreparable harm is no longer permissible and that the longstanding precedent referenced above has given way to a new standard. *Cf. New York City Triathlon, LLC v. NYC Triathlon Club, Inc.,* 704 F.Supp.2d 305, 343 (S.D.N.Y.2010). In *Salinger,* a copyright case, the Second Circuit stated that a "court must not adopt a 'categorical' or 'general' rule or presume that the [party seeking the injunction] will suffer irreparable harm (unless such a 'departure from the long tradition of equity practice' was intended by Congress)." *Salinger,* 607 F.3d at 80 (quoting *eBay v. MercExchange, L.L.C.,* 547 U.S. 388, 391, 393–94, 126 S.Ct. 1837, 164 L.Ed.2d 641

(2006)). A court must instead "actually consider the injury the [party] will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the 'remedies available at law, such as monetary damages, are inadequate to compensate for that injury.'" *Id.* (quoting *eBay,* 547 U.S. at 391, 126 S.Ct. 1837).

However, even if the presumption of irreparable harm is no longer permissible in Lanham Act cases, the Court would have little difficulty concluding that the parties have made an independent showing of irreparable harm. To demonstrate irreparable harm in a Lanham Act case, a party "must show two things: (i) that the parties are competitors in the relevant market, and (ii) that there is a 'logical causal connection between the alleged false advertising and its own sales position.'" *Zeneca Inc. v. Eli Lilly & Co.,* No. 99 Civ. 1452(JGK), 1999 WL 509471, at *36 (S.D.N.Y. July 19, 1999) (quoting *Johnson & Johnson v. Carter–Wallace,* 631 F.2d 186, 190–91 (2d Cir.1980)). The parties are certainly competitors in the rodenticide market and the sales of one party's products certainly impact the sales of the other's. Because of the uncertain regulatory climate, the parties are also effectively in a new market, where it would be difficult to quantify either party's lost sales. *See id.* at *39. In addition, "[p]rospective loss of this good will alone is sufficient to support a finding of irreparable harm." *New York City Triathlon,* 704 F.Supp.2d at 343. Thus, even if comparative advertising does not trigger an automatic presumption of irreparable harm, it is still certainly true that "[a] misleading comparison to a specific competing product . . . diminishes that product's value in the minds of the consumer." *McNeilab,* 848 F.2d at 38. Both parties have demonstrated prospective damage to their reputations if the injunction is not issued. (*See, e.g.,* PX34 (e-mail in which Defendant's sales manager explicitly calls Plaintiff's "credibility" into question); Defense Exhibit 16, at 4 (presentation by Plaintiff challenging Defendant's statements titled "Lets get our facts straight!").) Accordingly, the Court finds that each party has satisfactorily demonstrated irreparable harm.

### D. Likelihood of Success

Each party asserts that it is likely to succeed on the merits of its false advertising claim because its opponent's statements are literally false. A claim based on literal falseness "is best supported by comparing the statement itself with the reality it purports to describe." *Schering Corp. v. Pfizer Inc.,* 189 F.3d 218, 229 (2d Cir.1999). Under the "false by necessary implication" doctrine, "a district court evaluating whether an advertisement is literally false must analyze the message conveyed in full context" and find literal falsity where "the words or images, considered in context, necessarily imply a false message." *Time Warner,* 497 F.3d at 158 (internal quotation marks omitted). Thus, even where "no combination of words" on the page is untrue, a message can be "literally false" if the clear meaning of the statement, considered in context, is false. *Id.* at 154–55. To be literally false, however, the message must be unambiguous; if the representation "is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false" and the advertisement is actionable under the Lanham Act only upon a showing of actual consumer confusion. *Id.* at 158. When a court finds that an advertisement is literally false, it is unnecessary to rely on extrinsic evidence of consumer deception or confusion. *Id.* at 153.

### 1. Defendant's Statements

Plaintiff seeks to enjoin Defendant's use of the White Papers, statements

suggesting d-CON is subject to regulatory action, and statements suggesting that retailers will experience business disruption or penalties if they stock Plaintiff's product. For the reasons that follow, the Court finds that such statements, without clarification that Defendant is expressing only its opinion about future events, are literally false.

With regard to the White Papers, Plaintiff argues, *inter alia*, that "the headings and signature blocks of the NYSDEC White Paper (PX–1) and EPA White Paper (PX–3) are literally false in that they purport to issue from agencies." (Pl.'s Supp. Mem. at 4.) The Court agrees. Both White Papers lack any identification of authorship by Defendant, and include headings and other information creating the misleading impression that the papers were authored by the EPA and NYSDEC, respectfully. As the White Papers were authored by Defendant, not the agencies, these documents are literally false.

Similarly, it is literally false for Defendant to state that the RMD is a law, regulation, or anything else having current legal force. As the EPA has stated, the RMD "itself did not change the legal status of any rodenticide product, now or in the future. EPA did not cancel or suspend any rodenticide registrations, nor did it prohibit the sale of registered rodenticides that did not incorporate the specified registration measures." (*See* PX–61 at 11–12.)

It is also literally false for Defendant to state, with absolute certainty, that retailers carrying Plaintiff's products in New York State will experience disruptions to their businesses or penalties in 2011. Defendant has maintained in its presentations that retailers "will be liable for seizure o[f] products, quarantines and substantial fines if product remains on shel[ves]." (*See* PX–9 at 32.) While Defendant criticized

Plaintiff's position as "silly" (Nov. 12, 2010 Hr'g Tr. at 15:24), Plaintiff has demonstrated that its take on the current regulatory environment is accurate. NYSDEC has renewed Plaintiff's products' registrations through June 30, 2012. (*See* PX–111 at 2.) At the preliminary injunction hearing, NYSDEC representatives testified that whether the department will take future regulatory actions against manufacturers and retailers who persist in selling second-generation anticoagulants is up in the air and, at the very least, a long process would be required before NYSDEC could force Plaintiff or retailers to pull the products from the market. (*See* Dec. 15, 2010 Hr'g Tr. at 13:1–10, 16:9–20, 43:6 to 44:10, 49:6–7.) If Defendant wishes to tell retailers its opinion about possible future NYSDEC action, it may do so, but only if it makes clear to those retailers that it is only expressing its opinion in that regard. As currently phrased, Defendant's pronouncements as to the imminent seizures, quarantines, and fines awaiting retailers who carry Plaintiff's products are literally false.

### 2. Plaintiff's Statements

■■■ Defendant asks the Court to enjoin Plaintiff from stating that (1) Defendant has voluntarily cancelled its registrations for pre-mitigation consumer rodenticide products, (2) Plaintiff has a special and unique exemption from the EPA allowing it to sell pre-mitigation consumer rodenticides to retailers after June 4, 2011, (3) Plaintiff's d-CON products can be legally sold after June 4, 2011, (4) Plaintiff can continue to sell second-generation products after June 4, 2011, (5) the EPA is currently or will be enjoined from enforcing the RMD, and (6) retailers will suffer no adverse consequences from purchasing Plaintiff's products in 2011. The Court finds that

only the first, second, and fifth statements are literally false.

Plaintiff admits making the first statement and argues it is true. (*See* Nov. 16, 2010 Hr'g Tr. at 314–15.) However, Plaintiff's own witness admitted that Defendant has amended its registrations, and that amending and cancelling registrations are two different things. (*See* Deposition of Plaintiff, by David Long, Oct. 15, 2010 at 20–22.) The Court therefore finds that this statement is literally false.

With regard to the second statement, Plaintiff admits that it does not have a special exception, but denies making this statement. (*See* Nov. 16, 2010 Hr'g Tr. at 302–03.) However, the record demonstrates that such statements were made by Plaintiff's agents. For example, Defendant's witness Michael Rosen testified via declaration that he was told by a buyer "that d-CON told him that they were going to get 'special treatment' while other rodenticide manufacturers would have to comply with the law." (Rosen Decl. ¶ 7.) The Court finds this statement is literally false as well.

It is also literally false for Plaintiff to state that the EPA is enjoined from enforcing the RMD, as no injunction is currently in force. Plaintiff may state that it expects to receive such an injunction in the future, so long as Plaintiff is clear that it is speaking only about its future expectations. Whether those expectations prove accurate and the possible consequences that would flow from making inaccurate predictions to customers remain unclear. But as long as Plaintiff discloses the forward-looking and uncertain nature of its expectations, such statements are beyond the reach of the Lanham Act and better left to the market. Suffice it to say that there are risks inherent in predicting future regulatory action, and that customers may prove unforgiving toward those manufacturers whose predictions are later shown to be wrong.

The other statements Defendant asks the Court to enjoin Plaintiff from making are not literally false. As stated above, NYSDEC representatives made it clear at the preliminary injunction hearing in this case that, at the very least, a long process will be involved before the department will force Plaintiff to stop distributing its products. As a result, the Court cannot say that Plaintiff will be unable to sell its products after June 4, 2011, that such products will be considered misbranded, or that retailers will suffer adverse consequences from purchasing Plaintiff's products for sale in the year 2011. Defendant's assertions to the contrary were clearly belied by the evidence introduced at the preliminary injunction hearing.[4]

## E. Balance of Equities

As discussed above, both parties have demonstrated irreparable harm if the statements continue to be made. In contrast, neither party can assert an equitable interest in the perpetuation of an

---

4. After the conclusion of the preliminary injunction hearing, the Court received a letter from Defendant dated January 13, 2011, requesting permission to submit recent filings from Plaintiff's litigation against the EPA; a letter from Plaintiff dated January 13, 2011, opposing the request; a letter from Defendant dated January 14, 2011, responding to Plaintiff's letter; and a letter from Plaintiff dated January 14, 2011, asking the Court to strike Defendant's reply letter. The Court denies Defendant's request for permission to submit the filings in the EPA litigation, and notes that such filings, even if considered, would not change the Court's analysis as it remains clear that (1) the RMD is not a law or regulation, (2) the EPA will need to take other steps to implement the RMD, and (3) NYSDEC is unsure as to its future regulatory actions. Defendant's motion to strike is denied as moot.

advertising campaign that is literally false. *See Zeneca,* 1999 WL 509471, at *41. Both parties can continue, without violating the Lanham Act, to disseminate truthful information about the EPA and NYSDEC actions and their opinions on the same, so long as they clearly label their opinions as such.

### F.   Public Interest

■ " 'In exercising their sound discretion, courts of equity should pay particular regard [to] the public consequences in employing the extraordinary remedy of injunction.' " *Winter,* 129 S.Ct. at 376–77 (quoting *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)). "[T]he public interest is served by preventing customer confusion or deception." *Osmose, Inc. v. Viance, LLC,* 612 F.3d 1298, 1321 (11th Cir. 2010). There is certainly a public interest in the flow of information, including information about the potential impact of regulators' actions, and the Court will craft the relief awarded to both parties to ensure that neither Plaintiff nor Defendant is prevented from expressing its opinion about the EPA and NYSDEC actions, so long as the parties' statements are not inherently untrue.

### CONCLUSION

For the foregoing reasons, pending final determination of this action, Defendant and its officers, agents, servants, employees, representatives, subsidiaries and affiliates, are HEREBY ORDERED:

(1) To refrain from using the White Papers without clear language or graphics attributing the statements contained within to Defendant, not the EPA or NYSDEC;

(2) To refrain from stating or communicating, in its advertising or promotional materials or activities for its products, that the EPA's RMD is a law or regulation; and

(3) To refrain from stating or communicating, in its advertising or promotional materials or activities for its products, that retailers who choose to carry d-CON in 2011 will experience a disruption to their business, substantial fines and penalties, or any words to that effect, without making clear that Defendant is only expressing its opinion about possible future actions by regulators.

For the foregoing reasons, pending final determination of this action, Plaintiff and its officers, agents, servants, employees, representatives, subsidiaries and affiliates, are HEREBY ORDERED:

(1) To refrain from stating or communicating, in its advertising or promotional materials or activities for its products, that Defendant has voluntarily cancelled its current registrations for pre-mitigation consumer rodenticide products;

(2) To refrain from stating or communicating, in its advertising or promotional materials or activities for its products, that Plaintiff has a special exemption from the EPA allowing it to sell pre-mitigation consumer rodenticides to retailers after June 4, 2011, and that no other rodenticide manufacturer has such an exemption; and

(3) To refrain from stating or communicating, in its advertising or promotional materials or activities for its d-CON products, that Plaintiff has obtained an injunction preventing the EPA from enforcing the RMD, unless such an injunction has been obtained.

The Clerk of Court is respectfully directed to terminate the motion located at docket number 14.

IT IS FURTHER ORDERED THAT the parties shall appear for a telephonic status conference on February 3, 2011 at

4:30 p.m. The parties shall gather on one line, then contact the Court at (212) 805–0264.

IT IS FURTHER ORDERED THAT, by January 27, 2011 at 4:00 p.m., the parties shall jointly submit a letter, not to exceed five (5) pages, providing the following information in separate paragraphs:

(1) A brief statement of the nature of the action and the principal defenses thereto;

(2) A brief explanation of why jurisdiction and venue lie in this Court;

(3) A brief description of all outstanding motions and/or outstanding requests to file motions;

(4) A brief description of any discovery that has already taken place, and that which will be necessary for the parties to engage in meaningful settlement negotiations;

(5) A list of all prior settlement discussions, including the date, the parties involved, and the approximate duration of such discussions, if any;

(6) The estimated length of trial; and

(7) Any other information that the parties believe may assist this Court in resolving this action.

IT IS FURTHER ORDERED THAT, by January 27, 2011 at 4:00 p.m., the parties shall submit to the Court a proposed case management plan and scheduling order. A template for the order is available at http://www1.nysd.uscourts.gov/judge_info.php?id=99.

The status letter and the proposed case management plan should be emailed to my chambers at the following email address: sullivannysdchambers@nysd.uscourts.gov. Please consult my Individual Rules with respect to communications with chambers and related matters.

SO ORDERED.